RWP/KEK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6330-CR-HURLEY

NIGHT BOX
FILED

FEB 26 2001

CLERK, USDC / SDFL / WPB

UNITED STATES OF AMERICA,

        Plaintiff,

v.

FERNANDO PINEDA,

        Defendant.
_____/

REVISED GOVERNMENT'S RESPONSE TO MOTION TO SUPPRESS EVIDENCE
SEIZED AND STATEMENTS OBTAINED FROM FERNANDO PINEDA

**COMES NOW** the United States of America, by and through its undersigned Assistant United States Attorney, and files its Response to Defendant Fernando Pineda's Motion to Suppress Evidence Seized and Statements Obtained from Defendant on November 17, 2000, and in support thereof states:

1. On November 17, 2000, members of the Broward County Domestic Interdiction Unit (DIU) were working in the terminal area of the Fort Lauderdale/Hollywood International Airport. At approximately 9:20 a.m., Border Patrol Agent John Solek and DEA Agent Bob Shinn observed a male subject later identified as Fernando Pineda standing in the Spirit Airlines ticket line, wearing a full length green wool trench coat, even though the temperature outside the airport terminal was approximately 80

degrees. While standing in line, Pineda was observed continually looking at and adjusting the waist band of his pants, and appeared to be very nervous. Pineda was also wearing a white shirt, which was worn outside of his pants, concealing his waistline. In the agents' training and experience conducting narcotics investigations at the Fort Lauderdale International Airport, and the Agent's numerous past experiences with drug couriers at Spirit Airlines, this is common among body carriers of controlled substances who are trying to conceal bulky packaging of controlled substances.

2. An announcement was made by Spirit Airlines that holders of electronic tickets should go directly to the gate to obtain their respective boarding passes. Pineda exited the line and proceeded to the boarding gate. Agents Solek and Shinn, wearing plain clothes, approached Pineda from the side and identified themselves as law enforcement officers and displayed their respective badges and photo identification. At no time were firearms, handcoffs, or radios displayed, nor was the defendant's pathway blocked to the plane. Pineda agreed to speak with the agents and stated that he was traveling to New Jersey for a U.S. Postal Service job interview. Agent Solek asked Pineda if he had any narcotics on his person or inside his carry on bag, which Pineda replied "no." Agent Solek requested permission to search Pineda and his carry on bag, which Pineda agreed. Agent Solek conducted a pat down search of Pineda and felt numerous hard

pellets above the groin area of the defendant. Agent Shinn asked Pineda "what do you have," at which time defendant Pineda replied that he had heroin.

3. This police-citizen encounter lasted no more than two minutes up to this point. In order to continue the search in a more private area, defendant Pineda was placed in investigative detention and escorted to the airport DIU office, where he consented to removal of his pants. Upon lifting up Pineda's shirt, Agent Shinn observed the top portion of (2) white cotton socks partially hanging over the waistline of Pineda's pants. Upon further examination of the socks, Agent Shinn observed numerous hard pellets wrapped in clear plastic. These pellets weighed approximately 1.9 pounds gross weight. Detective Jose Interian field tested one of the pellets, which tested positive for heroin, a Schedule I controlled substance, at which time defendant Pineda was placed under arrest.

4. Agent Solek advised Pineda of his Constitutional Rights per Miranda and received acknowledgment from Pineda that he understood his rights and agreed to waive same. Defendant Pineda thereafter reported that he swallowed approximately 150 heroin pellets on November 14, 2000, which he obtained from Jorge LNU in Medellin, Colombia. The following day, Pineda flew to Miami, Florida, on Aces Airlines, at which time he obtained a room at a Travel Lodge close the Miami International Airport. Pineda passed

the majority of the pellets at that location, then proceeded to stay with his father in Miami, where he passed several more.

5. On November 17, 2000, Pineda drove to the Fort Lauderdale International Airport, and attempted to travel on Spirit Airlines Flight 456 en route to Newark International Airport, Newark, New Jersey; however he was apprehended by law enforcement. Pineda further stated that he was instructed by Jorge LNU to meet an unknown male at a location in Manhattan, New York, the following day and give the unknown male the heroin for distribution. Pineda advised that he would be paid $10,000.00 in U.S. currency by the New York contact for the transportation of the heroin from Colombia to New York City.

6. Defendant Pineda further advised that he believed that he still had 1 or 2 heroin pellets inside his body, at which time he was transported to the Broward General Hospital and examined by a medical doctor. Pineda passed an additional (4) pellets at the hospital and was re-examined by the doctor, who authorized medical clearance so he could be taken into custody and transported to the Fort Lauderdale City Jail.

## ARGUMENT

A.  **The Agents had authority to approach and speak with the Defendant if not reasonable suspicion to conduct pat down search during an Encounter that did not first amount to arrest.**

The Eleventh Circuit has identified three tiers of police-citizen encounters with respect to the fourth amendment: (1)

police-citizen communications involving no coercion or detention; (2) brief "seizures;" and (3) full-scale arrests. United States v. Espinosa-Guerra 805 F.2d 1502, 1506 (11th Cir. 1986), (citing, United States v. Berry, 670 F.2d 583 (5th Cir. Unit B 1982) (en banc)).

The second category involves reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave. Id., (citing, Immigration and Naturalization Service v. Delgado, 466 U.S. 210 (1984)). In this category, a law enforcement officer does not need probable cause to stop a person for questioning as long as he can articulate specific facts and inferences that lead to a reasonable suspicion of criminal activity. Terry v. Ohio, 393 U.S. 1, 19 n.16, 21 (1968); see also, Florida v. Royer, 460 U.S. 491 (1983) (Reasonable and articulable suspicion existed to approach the defendant where detectives observed the defendant carrying American Tourister luggage, which appeared to be heavy, he was young, casually dressed, appeared pale and nervous, continuously looked around at other people, and paid for his ticket in cash); United States v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir. 1986),

The "reasonable suspicion" that is required is no more than "some minimal level of objective justification" for the stop. United States v. Diaz, Slip Op. 91-5719 at 913 (citing, United States v. Sokolow, 490 U.S. at 7, quoting, Immigration and

Naturalization Service v. Delgado, 466 U.S. at 217)). To determine whether police conduct in an airport stop is so coercive that a reasonable person would not feel free to ignore police questioning and simply walk away, the court will inquire as to whether the police physically block an individual's path to board or leave an airplane flight, place implicit restraints on the citizens freedom by retaining his or her ticket for more than a minimal time or by taking the ticket to an airline ticket counter, intimate that the investigation has focused on the individual or indicate that the failure to respond to questioning or a request to search suggests guilt. United States v. Waksal, 709 F.2d 653, 658 (11th Cir. 1983). If the police do not interfere with an airport traveler's progress, or do not exhibit indicia of authority tending to cause anxiety among citizens and delay a traveler for only a brief time, a stop can be of such limited scope and noncoercive as not to invoke Fourth Amendment protections. Id. The level of suspicion required is considerably less than that required for probable cause. Probable cause requires a fair probability that contraband or evidence of a crime will be found. United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990), (citing, United States v. Sokolow, 490 U.S. 1 at 7). See also United States v. Allison, 953 F.2d 1346, 1350 (11th Cir. 1992) (Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials of which they have reasonably trustworthy

information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed).

Defendant Fernando Pineda contends that the agents lacked reasonable suspicion or probable cause to stop him in the Fort Lauderdale Airport because most of the information they corroborated was "innocent" in nature. At the time of the airport encounter, the officers were reacting to a swiftly developing situation. In this case, the Border Patrol agents and members of the Broward County Domestic Interdiction Unit (DIU), knew that they had made fifteen (15) other drug courier arrests within the last twelve (12) months, at the Fort Lauderdale Airport, specially passengers using Spirit Airlines traveling to northern destinations. The agents began with a permissible two (2) minute police-citizen communication in which the defendant Pineda was free to leave; the agents did not block the defendant's pathway to his flight; displayed no guns nor used any force; and when they explained that they were members of a narcotics unit, defendant Pineda agreed to voluntarily speak to them.

As the Supreme Court has repeatedly stated, "[t]he concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.'" United States v. Sokolow, 490 U.S. at 7 (quoting, Illinois v. Gates, 462 U.S. at 232). "Innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to sub

silentio impose a drastically more rigorous definition of probable cause than the security of our citizens' demands." Illinois v. Gates, 462 U.S. at 243, n.13.  In making a determination of probable cause, the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.  United States v. Sokolow, 490 U.S. at 9-10.

Here, DEA agents observed defendant standing in the Spirit Airlines ticket line, a known Airline for drug couriers, wearing a full length green wool trench coat, even though the temperature outside the airport terminal was approximately 80 degrees. Defendant continually looked at and adjusted the waist band of his pants upward, and appeared to be very nervous, repeatedly looking from side to side.  Defendant also wore a white shirt, which was worn outside of his pants, concealing his waistline.  Based on these actions by the defendant, in combination with each other, and in light of the Agent's training and experience conducting narcotics investigations at the Fort Lauderdale Airport, the Defendant reasonably appeared to be a body carrier of controlled substances who was trying to conceal bulky packaging of controlled substances.

The Supreme Court has consistently validated stops upon circumstances far less compelling than those present in the instant case.  See, e.g., United States v. Mendenhall,446 U.S.544 (1980)

(investigatory stop justified where agents observed the defendant arrive on a flight from Los Angeles, a city believed by the agents to be the place of origin for much of heroin brought to Detroit, the defendant appeared very nervous, completely scanned the whole area where the agents were standing, and after leaving the plane the defendant proceeded past the baggage area without claiming any luggage); United States v. Berry, 670 F.2d 583 (5th Cir. 1982) (reasonable suspicion justified where defendant stared intently at the agents when leaving the airport gate and again in the baggage claim area while walking back and forth several times in from of the agents, repeatedly looked nervous toward agents while walking down the concourse toward the baggage-claim area and while waiting in the area); United States v. Armstrong, 722 F.2d 681, 683 (11th Cir. 1984).

    **B.**    **The Pre-Arrest Statements were made by the Defendant During an Encounter that did not amount to Custodial Interrogation.**

The defendant further contends that he was arrested without probable cause and that his statements are now subject to suppression. During the questioning, the agents pursued their investigation in a diligent and reasonable manner. At no time did the Agents restrict Pineda's pathway to his flight, nor take his plane ticket, and Pineda's conversation with the Agents was a mere two minutes in duration. The agents asked Pineda if he had any narcotics on his person or inside his carry on bag, which Pineda

replied "no." Agent Solek requested and was given permission to search Pineda and his carry on bag. Agent Solek conducted a brief pat down search of Pineda and felt numerous hard pellets above the groin area of the defendant. Agent Shinn asked Pineda "what do you have," at which time defendant Pineda voluntarily replied that he had heroin.

When the subject of a search is not in custody and the government attempts to justify a search on the basis of his consent, the government must demonstrate that the consent was in fact voluntarily given. Schneckloth v. Bustamonte, 412 U.S. 218 at 247 (1973). Neither "linguistics nor epistemology provides a ready definition of the meaning of "voluntariness." Id at 222. Such a term reflects an accommodation of complex values implicated in police questioning a suspect. Id at 224. The question of whether a consent to a search was "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. Id at 227. While knowledge of the right to refuse consent, or to leave, are factors to be taken into account, the government need not establish such knowledge in order to show a lawful consent search. United States v. Zapata, 180 F.3d 1237 (11th Cir. 1999). See also Schneckloth v. Bustamonte, 412 U.S. 218 (1973); United States v. Washingtion, 151 F.3d 1354, 1356 (11th Cir. 1998) ("The Supreme Court has steadfastly rejected the notion of imposing per se rules

on police officers conducting warrantless searches. Rather it is enough that the circumstances themselves indicate that the search can proceed only if consent is given"). That is, although consent must not be coerced, there is no requirement that the consent be shown to have amounted to an intentional relinquishment of a known right or privilege. <u>Tukes v. Dugger</u>, 911 F.2d 508 (11th Cir. 1990). <u>See also</u> <u>United States v. Bueno</u>, 21 F.3d 120 (6th Cir. 1994) (The defendant freely and voluntarily consented to a search when the defendant replied "yes" in response to the experienced agents' request to search his bag in the stairwell hallway of a New York airport, there were only two officers present, who identified themselves as police officers, displayed no weapons, where no physical touching occurred, and the officers exhibited no overbearing behavior, despite the fact that the defendant was never told that he could not leave the area, nor was threatened with further detention if he refused to consent to a search of his checked luggage, and where the minor detention lasted no more than five minutes).

　　In order to continue the search in a more private area, Defendant Pineda was placed in investigative detention and escorted to the airport DIU office, where he consented to removal of his pants. Upon lifting up Pineda's shirt, Agent Shinn observed the top portion of (2) white cotton socks partially hanging over the waistline of Pineda's pants. Upon further examination of the

socks, Agent Shinn observed numerous hard pellets wrapped in clear plastic. These pellets weighed approximately 1.9 pounds gross weight. Detective Jose Interian field tested one of the pellets, which tested positive for heroin, a Schedule I controlled substance, at which time defendant Pineda was formally placed under arrest. See United States v. Sharpe, 470 U.S. 675, 686 (1985); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1221 (11th Cir. 1993).

Miranda v. Arizona, 384 U.S. 436 (1966) requires that a person be advised of certain constitutional rights before undergoing custodial interrogation.[1] It reflects the concern that the compulsive or coercive aspects of a custodial situation will cause a suspect to confess or to make incriminating statements involuntarily, not knowing of the fifth amendment protection against self-incrimination. United States v. Henry, 604 F.2d 908 (5th Cir. 1979), overruled on other grounds by United States v. Bengivenga, 845 F.2d 593 (5th Cir.) (en banc), cert. denied, 488 U.S. 924 (1978).[2]

---

[1] A person subjected to custodial interrogation must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has a right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. Miranda v. Arizona, 384 U.S. 436 (1966).

[2] Decisions of the Fifth Circuit Court of Appeals prior to September 30, 1981 are binding precedent on this Court. Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981).

"Custodial interrogation" within the meaning of the Miranda rule encompasses questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Oregon v. Mathiason, 429 U.S. 492 (1977). The Eleventh Circuit has enunciated a refined test for determining whether a suspect is in custody for purposes of the Miranda rule. In United States v. Phillips, 812 F.2d 1355 (11th Cir. 1987), this Circuit Court recognized that recent decisions of the United States Supreme Court had narrowed the focus of analysis:

> The [Supreme] Court has stated that the ultimate inquiry, based on the circumstances of each case, is whether there is a restraint on the suspect's freedom of movement "of the degree associated with a formal arrest." The Court has also expressly adopted an objective, reasonable man standard as the appropriate test in cases involving custody issues "because, unlike a subjective test, it 'is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question.'" In applying the objective test, therefore, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." . . . Thus, "[t]he mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings. . . ."

Id. at 1359-60 (citations omitted). Applying these precedents, this Court announced the following test:

> Under these guidelines in order for a court to

> conclude that a suspect is in custody, it must
> be evident that, under the totality of the
> circumstances, a reasonable man would feel a
> restraint on his freedom of movement fairly
> characterized as that "degree associated with
> formal arrest" to such an extent that he would
> not feel free to leave.

Id. at 1360.

As the Supreme Court has recognized, not every brief encounter of a suspect constitutes the degree of restraint necessary to implicate Miranda. In United States v. Mendenhall, 446 U.S. 544 (1980), the court held that where agents wore no uniforms and displayed no weapons, did not summon the defendant to their presence but instead approached her and identified themselves as federal agents and requested, but did not demand, to see defendant's identification and airline ticket, and where nothing suggested that defendant had any objective reason to believe that she was not free to end conversation and proceed on her way, agent's initial approach to defendant was not a "seizure," even though defendant was not expressly told by agents that she was free to decline to cooperate with their inquiry. In reaching this conclusion, the court reasoned that "not all personal intercourse between policemen and citizens involves "seizures" of person." Id at 552. "Characterizing every street encounter between a citizen and the police as a "seizure," while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement

14

practices." Id at 554. Moreover, "without the need for police questioning as an investigative tool, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved." Id at 554. The Court recognized that a person is "seized" only if in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Id at 554. See United States v. Berry, 670 F.2d 583 (5th Cir. 1982) (By itself, fact of stopping an individual specifically to attempt to show that he is smuggling drugs is not sufficient to show that cooperation with the police was coerced and, hence, that a Fourth Amendment seizure occurred); United States v. Bueno, 21 F.3d 120 (6th Cir. 1994) (Approaching a defendant on an airport concourse was a permissible and consensual encounter, and the court found no "seizure" for purposes of the Fourth Amendment, when a sergeant identified himself as a police officer, asked the defendant about his identity and travel itinerary, did not display a weapon or physically touch the defendant, promptly returned the defendant's ticket and identification, and where the defendant chose on his own volition to move into the stairwell from the concourse, and the detention lasted no more than five minutes); United States v. Armstrong, 722 F.2d 681 (11th Cir. 1984) (The Court held that a police-citizen contact in a public concourse at a West Palm Beach airport did not rise to the level of a "seizure" and thus is outside the realm of

Fourth Amendment protection. In reaching its decision, the Court found that the encounter took place at a West Palm Beach airport in a public concourse, the detectives were not wearing a uniform nor displaying a weapon, no physical contact ensued between the citizen and the detectives, and the only display of authority that occurred was when the detective approached the defendant and identified himself as a deputy sheriff and requested, but did not demand, to see the defendant's identification and ticket).

Thus, the evidence shows that defendant was questioned regarding his identity inside the Ft. Lauderdale airport while awaiting departure to New Jersey in an atmosphere that was free of threats, intimidation, or coercion. The Agents did not block the pathway of the defendant to his flight, and only delayed him a mere two minutes; consequently, it would be unreasonable for him to believe that he was under arrest or was restrained to the degree associated with a formal arrest. Accordingly, the circumstances did not implicate <u>Miranda</u> until after the defendant was asked to accompany the agents to the DIU Office whereupon he was arrested and then advised of his rights and began actively cooperating with the agents in an attempt to deliver the drugs to their destination. It should be noted that the Supreme Court has long held that the mere focusing of an investigation on a particular suspect does not trigger the need for <u>Miranda</u> warnings in noncustodial settings. <u>Minnesota</u> v. <u>Murphy</u>, 465 U.S. 420, 431 (1984).

### C. The Officers Lawfully Conducted a Warrantless Search of defendant.

The Supreme Court has made it clear that after making a valid custodial arrest, the police may lawfully conduct a warrant less search of a suspect without probable cause or reasonable articulable suspicion to believe that the suspect possesses either weapons or evidence. New York v. Belton, 453 U.S. 454, 461 (1981); Michigan v. DeFillippo, 443 U.S. 31, 35 (1979). The Court held that the police officer's general need to disarm a suspect during questioning or to preserve evidence justifies this type of search. United States v. Robinson, 414 U.S. 218, 234 (1973). Unlike a limited pat-down search during an investigative detention, the police may make a full search of the suspect for both weapons and evidence during a search incident to arrest. Robinson, 414 U.S. at 229. Defendant Pineda knowingly and voluntarily consented to the removal of his pants, which revealed numerous hard pellets wrapped in clear plastic found on the top portion of (2) white cotton socks partially hanging over the waistline of Pineda's pants. Detective Jose Interian field tested one of the pellets, which tested positive for heroin, a Schedule I controlled substance, at which time defendant Pineda was placed under arrest.

Agent Solek advised Defendant Pineda of his Constitutional Rights per Miranda and received acknowledgment from Pineda that he understood his rights and agreed to waive them. Since the Agents had made a valid probable cause arrest of the Defendant Pineda the

17

statement that he swallowed approximately 150 heroin pellets on November 14, 2000, which he obtained from Jorge LNU in Medellin, Columbia, should be admitted.

**WHEREFORE**, the Government respectfully urges the denial of defendant Fernando Pineda's Motion to Suppress Evidence Seized and Statements Obtained From Defendant on November 17, 2000.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: *Roger W. Powell*
ROGER W. POWELL
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No.341411
500 E. Broward Blvd., Suite 700
Fort Lauderdale, Florida 33394
Tel:(954)356-7255; Fax:356-7336

cc: Special Agent Bob Shinn,
    DEA

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was faxed by the United States, February 26, 2001 to:

    Mr. Martin J. Bidwill, Esq.
    Assistant Federal Public Defender
    Attorney for Defendant Pineda
    400 Australian Avenue, Suite 300
    West Palm Beach, FLorida  33401

                                                    /s/ Roger W. Powell
                                                    ROGER W. POWELL
                                                    ASSISTANT U.S. ATTORNEY