UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 00-6330-CR-HURLEY/VITUNAC

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

FERNANDO PINEDA,

    Defendant.
_____/



## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on general Order of Reference from United States District Judge Daniel T.K. Hurley for disposition and/or report and recommendation with respect to all pending pretrial criminal motions.

Before the Court is Defendant, PINEDA's, Motion to Suppress Evidence and Statements (DE 22). The Government filed a response (DE 27) and on February 26, 2001, the Government filed a revised response to its Motion to Suppress (DE 28). On Tuesday, February 27, 2001, this Court held an evidentiary hearing on Defendant's Motion to Suppress. The matter is ripe for review.

Defendant's Written Motion

PINEDA, claims that he was illegally seized by drug enforcement agents at the Ft. Lauderdale/Hollywood International Airport on November 17, 2000, at 9:20 a.m. PINEDA claims he was in line to obtain a boarding pass for Spirit Airlines but left that line and began walking to his gate pursuant to a Spirit Airlines announcement. While walking to his gate, PINEDA says that agents Shinn and Solek stopped and seized him. PINEDA states that



the officers searched his person without his consent, placed him in handcuffs, and took him to an office at the airport. The police removed his pants and thereafter discovered heroin.

PINEDA argues that this evidence was seized in violation of the Fourth Amendment because Solek and Shinn had neither probable cause nor reasonable suspicion to believe he had committed a crime before seizing him. PINEDA claims he was not advised of his rights per <u>Miranda</u> and that he was in custody when he made incriminating statements.

### Government's Written Response

In the Government's Revised Response it asserts that on November 17, 2000, that members of the Broward County Domestic Interdiction Unit were working at the Ft. Lauderdale/Hollywood International Airport. Agents Solek and Shinn observed (who we now know to be) PINEDA standing in the Spirit Airlines ticket line wearing a full length green wool trench coat. The temperature that morning was approximately 80 degrees. The Government's pleading indicates that the agents observed PINEDA continually looking at and adjusting the waistband of his pants. He appeared to be very nervous. He wore a long white shirt outside of his pants concealing his waistline. After an announcement by Spirit Airlines that holders of electronic tickets should go directly to the gate, PINEDA left the line and began walking towards the boarding gate. The agents approached PINEDA from the side and identified themselves as law enforcement officers and displayed their credentials. The agents were attired in street clothes which bore no indicia of law enforcement. According to the Government's response, PINEDA agreed to speak with the agents and told them that he was going to New Jersey for a postal service job interview. Agent Solek asked PINEDA if he had any narcotics on his person or in his bag to which PINEDA replied no. Solek asked permission to search PINEDA and his carry-on bag and

PINEDA agreed. Shinn searched the bag and Solek conducted a pat-down of PINEDA. He felt numerous "pellets" in the groin area of the Defendant. Shinn asked the Defendant, "What do you have?" and PINEDA replied, "heroin".

Government asserts that this encounter lasted no more than two minutes. The Defendant was then escorted to a detention office where he was asked to remove his outer pants. PINEDA had white socks hanging over the waistline of his pants which contained numerous heroin pellets weighing approximately two pounds. PINEDA was then advised of his rights per <u>Miranda</u> which rights he waived. He admitted swallowing 150 pellets on November 14, 2000. He body carried those pellets from Medellin, Colombia, to Miami, Florida, and then he drove to Ft. Lauderdale on November 17, 2000, in an attempt to take those pellets to Newark, New Jersey.

It is unclear from the Government's Revised Response if the Government is asserting that the encounter by PINEDA with law enforcement was a police/citizen communication involving no coercion or detention, or a brief "seizure" under <u>Terry</u>. In any event, the Government asserts that the stop comports with the dictates of the Fourth Amendment and that the Defendant was not subjected to custodial interrogation until he was formally placed under arrest and advised of his rights per <u>Miranda</u>.

The Evidentiary Hearing

Four witnesses testified at the evidentiary hearing. John Solek testified. Solek is a senior border patrol agent. He has been in law enforcement for 17 years. He spent the last 10 years with United States Border Patrol. Prior to that he was a police officer for 2 years in Hamilton, Indiana, and 5 years in Gostin, Indiana. He has a four year college degree in Business. Solek is cross sworn as a Broward County Sheriff's Deputy. Robert

P. Shinn testified. Shinn has been a drug enforcement agent for the past 3 1/2 years. Prior to that he spent 8 years with the St. Louis, Missouri, police department. He has a Bachelor of Science from S.I.U. in Justice Administration. Fernando Pineda, the Defendant, testified. He is 32 years old. Eduardo Santiago testified. He is a staff investigator for the office of the Public Defender and works for Martin Bidwill.

Solek testified that on November 17, 2000, he was working at the Ft. Lauderdale/Hollywood Airport at terminal 4. He was in plain clothes. He was not openly wearing a badge, nor gun, nor handcuffs. Neither his shirt nor pants had any police markings on them. Solek testified that at approximately 9:20 a.m. or 9:25 a.m., he was watching people standing in line at Spirit Airlines. Spirit Airlines is known to law enforcement as the airline of choice for drug couriers at the Ft. Lauderdale/Hollywood Airport.

Solek testified that he saw PINEDA in the Spirit Airlines line. PINEDA was wearing a large full-length green heavy wool coat, baggy pants and a white shirt pulled out over the top of the pants. The white shirt hung down to the mid-thigh area of PINEDA. As Solek watched, PINEDA pulled the coat closed five or six times. PINEDA then opened the coat and pulled down the shirt and flattened it with his hands. Solek observed PINEDA look down towards his abdomen and then smooth the shirt again. PINEDA then looked all around the airport as if conducting "counter surveillance." According to Solek, PINEDA repeated this activity at a minimum of five or six times. Shinn testified that he observed the same things as Solek. Shinn testified that PINEDA stood out like "a neon sign". Shinn said it was very hot that day and that no other passenger was wearing a heavy coat, much less a full-length heavy thick wool coat. It was approximately 80 degrees outside. A

temperature guide introduced by Defendant shows the temperature in Miami that day was 88 degrees. Shinn agreed with Solek that PINEDA looked around the entire time he was in line and kept adjusting his waistband. Shinn stood up in open court and demonstrated the activities allegedly taken by PINEDA.

Both Solek and Shinn testified that they watched PINEDA for several minutes while he was in line and then observed him leave the line after a Spirit Airlines announcement that electronic ticket holders could go directly to the gate. PINEDA left the line and began heading towards the gate. Solek and Shinn approached PINEDA from his left rear. Solek touched PINEDA's shoulder and said, "Excuse me sir, would you mind speaking with me." Defendant said he would not mind speaking with the officers and stopped. At the time that Solek said, "Do you mind speaking with me," he and Shinn displayed identification tags and badges.

Solek asked PINEDA about his travel. PINEDA responded that he was traveling from Ft. Lauderdale to New Jersey to interview for a postal job. Solek asked PINEDA if he had any checked luggage or only the one bag which he was carrying. PINEDA responded, "This is my only luggage." He was asked whether or not he had any weapons or contraband on him and PINEDA responded, "No". Solek then asked, "Can I search the bag?" and PINEDA said, "Yes". Solek testified that he then asked, "Do you have anything around your waist?" and PINEDA said, "No". Solek testified that he next asked, "Can I do a pat down?" and PINEDA said, "Yes, o.k." and on his own turned around for the agent to pat him. Solek patted the Defendant's waist and felt numerous hard objects in the groin area. Either Shinn or Solek said, "What is this or What is that?" and PINEDA responded, "heroin". PINEDA was then removed to a detention office at the airport. PINEDA was

5

thereafter advised of his rights per <u>Miranda</u> and made incriminating statements.

Fernando Pineda testified. PINEDA testified that he wore his long wool coat on the day in question because he is a diabetic and had a fever. He stated that while in line to get a boarding pass that he was tugging at his pants because he wears a size 38 pants and he was wearing size 36 pants which were too small. However, PINEDA claims that he was not tugging at his pants as often as claimed by the officers.

PINEDA said he left the line when the announcement came over the loud speaker for passengers with electronic tickets to proceed to the gate. He says that the officers approached him and blocked his path by coming up from behind him and standing in front of him. The officers said, "Can I ask you a few questions?" and he said, "Yes". PINEDA then testified that the officers asked him where he was going, whether or not he had any weapons, to which he responded, "No". PINEDA says that Solek identified himself as a border patrol agent and that PINEDA asked, "Why border patrol was at the Ft. Lauderdale airport?" PINEDA testified that Solek told him that Florida was surrounded by water so that he had to be there. PINEDA then said that Solek touched him on his right shoulder and showed him where to stand out of the way of the passengers attempting to walk to the gate. Solek asked PINEDA if he could check his bag and PINEDA said, "Yes". Then according to PINEDA the officer "raised me up" and told me to back up. "He asked if I had any drugs on me and I said, no." He then patted me down. PINEDA admits being read his rights by Solek after he was taken to the office. Defendant testified that he was not nervous and did not exhibit any nervousness when the officers questioned him. He testified that "I felt not [sic] be nervous." PINEDA admitted that while talking to the agents he never said he had to leave because he had to catch a plane and that he never asked

to go. He also stated that he could have left if he wanted to. He testified that nothing was blocking his path on at least one side if he had chosen to walk away.

## Discussion

The facts of the instant case are strikingly similar to those in <u>United States v. Mendenhall</u>, 446 U.S. 544, 100 S. Ct. 1870 (1980). In <u>Mendenhall</u>, two drug enforcement agents observed the Defendant at the Detroit Metropolitan Airport. She arrived on a flight from Los Angeles and the agents observing her felt that she fit a drug courier profile. The agents testified that the fact that she arrived from Los Angeles (a known heroin city), that she was the last person to leave the plane, that she appeared very nervous and scanned the whole area where the agents where standing and left without claiming any baggage made them suspicious of the Defendant. The agents approached her as she was walking through the concourse and identified themselves as federal agents and asked to see her identification and airline ticket. Her identification and airline ticket bore different names and she was asked to explain the discrepancy. The agents then returned her ticket and drivers license to her and then asked her if she would accompany them to the DEA office for further questioning. She said, "yes." At the office she was asked to allow a search of her person and handbag and was also told she had the right to refuse that search. She responded, "go ahead" and after being searched heroin was found on her person.

The trial court denied a motion to suppress which denial was reversed by the Court of Appeals. The Supreme Court reversed the Court of Appeals and in reversing held:

> We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to

prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." United States v. Martinez-Fuerte, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

Moreover, characterizing every street encounter between a citizen and the police as a "seizure," while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. "Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. Haynes v. Washington, 373 U.S. 503, 515, [83 S.Ct. 1336, 1344, 10 L.Ed.2d 513]." Schneckloth v. Bustamonte, 412 U.S., at 225, 93 S.Ct., at 2046.

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.[6] Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See Terry v. Ohio, supra, 392 U.S., at 19, n. 16, 88 S.Ct., at 1879, n. 16; Dunaway v. New York, 442 U.S. 200, 207, and n. 6, 99 S.Ct. 2248, 2253, 60 L.Ed.2d 824; 3 W. LaFave, Search and Seizure 53-55 (1978).  In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

On the facts of this case, no "seizure" of the respondent occurred. The events took place in the public concourse. The agents wore no uniforms and displayed no weapons. They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand to see the respondent's identification and ticket. Such conduct without more, did not amount to an intrusion upon any constitutionally protected interest. The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person

8

> asking the questions was a law enforcement official. See Terry v. Ohio, 392 U.S., at 31, 32-33, 88 S.Ct., at 1885-1886 (Harlan, J., concurring). See also ALI, Model Code of Pre-Arraignment Procedure § 110.1(1) and commentary, at 257-261 (1975). In short, nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure.
>
> Our conclusion that no seizure occurred is not affected by the fact that the respondent was not expressly told by the agents that she was free to decline to cooperate with their inquiry, for the voluntariness of her responses does not depend upon her having been so informed. See Schneckloth v. Bustamonte, supra. We also reject the argument that the only inference to be drawn from the fact that the respondent acted in a manner so contrary to her self-interest is that she was compelled to answer the agents' questions. It may happen that a person makes statements to law enforcement officials that he later regrets, but the issue in such cases is not whether the statement was self- protective, but rather whether it was made voluntarily.

United States v. Mendenhall, 446 U.S. 544, 553-556 (1980). (Footnote omitted)

In the instant case the officers approached PINEDA and tapped him on the shoulder to gain his attention. No weapons were displayed and the agents bore no indicia of law enforcement other than to briefly show PINEDA their credentials. The entire discourse between PINEDA between and the two agents took less than two minutes. This Court finds that PINEDA's path for exit from the agents was not blocked or hindered by the agents at any time. PINEDA voluntarily answered the agent's questions and voluntarily consented to the search of his bag and his person. The search of PINEDA was valid without probable cause and without reasonable suspicion.

PINEDA has moved to suppress statements that he made to the officers. He responded, "heroin" to the question "What is this?" This Court finds that PINEDA was not in custody for purposes of Miranda at the time he gave that answer. Any statements made by PINEDA after that time was made after he was fully advised of his rights per Miranda.

Defendant's sole basis for suppression of any statements is as "fruit of the poisonous tree" if his original arrest were found to be illegal. Because this Court finds that PINEDA's arrest and seizure comport with the dictates of the Fourth Amendment, his statements are not "fruit of the poisonous tree."

### Recommendation

This Court therefore recommends to the District Court that Defendant's Motion to Suppress Evidence and Motion to Suppress Statements be DENIED in its entirety.

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable United States District Judge Daniel T.K. Hurley, within ten (10) days after being served with a copy. See 28 U.S.C. § 636(b)(1)(C). Failure to file timely objections may limit the scope of appellate review of factual findings contained herein. See United States v. Warren, 687 F.2d 347, 348 (11th Cir.1982) cert. denied, 460 U.S. 1087 (1983).

DONE and SUBMITTED in Chambers at West Palm Beach in the Southern District of Florida, this ____ day of March, 2001.

_____
ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE

Copies to:

AUSA - Roger W. Powell
AFPD - Martin J. Bidwill