UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6330-CR-HURLEY/VITUNAC

UNITED STATES OF AMERICA,

Plaintiff,

v.

FERNANDO PINEDA,

Defendant.

_____/

**NIGHT BOX
FILED**

APR 0 2 2001

CLERK, USDC / SDFL / WPB

## DEFENDANT'S NOTICE OF FILING

COMES NOW the defendant Fernando Pineda, by and through his undersigned attorney, and files his Notice of Filing, providing for the Court's consideration in conjunction with Defendant's Objections to Report & Recommendation on the defendant's Motion To Suppress the following materials: (1) Transcript of February 27, 2001, Evidentiary Hearing; (2) Report and Recommendation of United States Magistrate Judge Lurana S. Snow, dated November 30, 2000, and adopted by Judge Ferguson, in the case of the *United States v. Francisco Perez*, 00-6197-CR-FERGUSON.

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By: _____

Martin J. Bidwill
Assistant Federal Public Defender
Florida Bar No. 868795
400 Australian Avenue North, #300
West Palm Beach, FL 33401
Telephone: (561) 833-6288/833-0368(fax)

<u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the aforementioned notice was mailed on this

day of April, 2001, to Assistant United States Attorney Roger Powell, 299 East Broward

Boulevard, Fort Lauderdale, Florida 33301.

Martin J. Bidwill

1

1            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF FLORIDA

3              WEST PALM BEACH DIVISION

4

5    UNITED STATES OF AMERICA,    .   CASE 00-6330-CR
                                  .
6            PLAINTIFF,           .   WEST PALM BEACH, FLORIDA
                                  .   FEBRUARY 27, 2001
7            V.                   .
                                  .
8    FERNANDO PINEDA,             .
                                  .
9            DEFENDANT.           .
                                  .
10   . . . . . . . . . . . . . . .

11

12

13         TRANSCRIPT OF MOTION TO SUPPRESS HAD

14        BEFORE THE HONORABLE ANNE VITUNAC,

15              MAGISTRATE JUDGE.

16

17

18                  - - - - -

19            PAGES 1 THROUGH 100

20                  - - - - -

21

22                              Original-- - - -
                                Copy      - - - - - -
23

24

25

                  BRYNN DOCKSTADER, RMR
                    (305) 523-5635

2

1   APPEARANCES:

2

    FOR THE GOVERNMENT:   ROGER POWELL, AUSA
3                         U.S. ATTORNEY'S OFFICE

4

    FOR THE DEFENDANT:    MARTIN BIDWILL, AFPD
5                         FEDERAL PUBLIC DEFENDER'S OFFICE

6

7

    COURT REPORTER:       BRYNN DOCKSTADER, RMR
8                         CONTRACT COURT REPORTER
                          UNITED STATES DISTRICT COURT
9                         301 N. MIAMI AVE., ROOM 396
                          MIAMI, FLORIDA  33128
10                        (305) 523-5632

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BRYNN DOCKSTADER, RMR
(305) 523-5635

3

1                          INDEX OF PROCEEDINGS

2                                                              Page

3    WITNESSES
     FOR THE GOVERNMENT:
4    JOHN SOLEK
     Direct Examination by Mr. Powell               5
5    Cross-Examination by Mr. Bidwill               19
     Redirect Examination by Mr. Powell             44
6

7    ROBERT P. SHINN
     Direct Examination by Mr. Powell               46
8    Cross-Examination by Mr. Bidwill               53

9

10   WITNESSES FOR THE DEFENSE:
     ED SANTIAGO
11   Direct Examination by Mr. Bidwill              69
     Cross-Examination by Mr. Powell                72
12

13   FERNANDO PINEDA
     Direct Examination by Mr. Bidwill              73
14   Cross-Examination by Mr. Powell                85

15

16                              EXHIBITS

17   FOR THE DEFENSE:

18   1-                                             70

19   2-                                             70

20   3-9                                            71

21   11, 13, 14, 15, 16                             75

22   12                                             75

23   17, 18                                         85

24

25

                      BRYNN DOCKSTADER, RMR
                        (305) 523-5635

4

<u>TUESDAY, FEBRUARY 27, 2001</u>

1

2    **THE COURT:**  Good morning, Mr. Pineda.

3    **THE DEFENDANT:**  Good morning.

4    **THE COURT:**  Are you feeling better?

5    **THE DEFENDANT:**  Yes, a little bit better.

6    **THE COURT:**  If you need anything else to eat, just

7  let us know.  All right.  This is the United States of

8  America versus Fernando Pineda, case 00-6330 Criminal

9  Hurley.

10        Mr. Powell, I'm going to give you a copy of the

11  Local Rule 5.1 for the style of the case.  Maybe we can all

12  apply it in the same -- we'll get you a copy of that so your

13  secretary can type it properly.

14    **MR. POWELL:**  Okay.

15    **THE COURT:**  Thanks.  It's your burden.

16    **MR. POWELL:**  Yes, ma'am.  United States would

17  call -- does the Court wish argument before we begin?

18    **THE COURT:**  Argument?  No.  Opening statement,

19  yes.

20    **MR. POWELL:**  Okay.

21    **THE COURT:**  Brief.

22    **MR. POWELL:**  The defense filed a motion to

23  suppress the stop and search and the government filed a

24  response.

25    **THE COURT:**  I got that much.

BRYNN DOCKSTADER, RMR
(305) 523-5635

5

1          **MR. POWELL:**  The second response, hopefully the
2    cites are correct in the second one.

3          Briefly, this is a case, Your Honor, of a simple
4    approach.  The government's position it was an airport
5    approach by two experienced agents.  The defendant was not
6    arrested or detained.

7          They make these routine approaches all the time
8    when they are suspicions are heightened, and we feel like
9    that in this case, the facts warrant the agents' questioning
10   of the defendant and approach to discuss his travel and his
11   luggage and his person, which resulted in his freely and
12   voluntarily consenting to a search.

13         And then the discovery of narcotics and in all, we
14   have a passenger that is flying out of Ft. Lauderdale,
15   wearing a green wool full-length trench coat in 80-degree
16   temperatures, looking around constantly, and at the same
17   time after -- from the start to the finish of the discussion
18   was less than two minutes.

19         So, we feel like for those reasons, that the
20   agents' actions in this case were fully warranted.

21         **THE COURT:**  Mr. Bidwill, do you want to reserve?

22         **MR. BIDWILL:**  I'll reserve, Judge.

23         **THE COURT:**  Call your first witness.

24         **MR. BIDWILL:**  I'd invoke the rule at this time.

25         **THE COURT:**  Okay.  They are all agents?

1        **MR. POWELL:**  Just two, Your Honor.

2        **THE COURT:**  They know the rule.

3        **MR. POWELL:**  United States calls Boarder Patrol

4   Agent John Solek to the stand at this time.

5        **THE COURT:**  Raise your right hand please sir.

6                    **JOHN SOLEK,**

7   called as a witness on behalf of Government, having been duly

8   sworn by the Court, was examined and testified as follows:

9        **THE WITNESS:**  I do.

10       **THE COURT:**  Have a seat, please, sir.  Could you

11  state your full name and spell your last name.

12       **THE WITNESS:**  John Solek.  S-O-L-E-K.

13       **THE COURT:**  Your profession, sir?

14       **THE WITNESS:**  I'm a senior patrol agent with the

15  United States Border Patrol assigned to Pembroke Pines

16  station in Florida.

17       **THE COURT:**  Have long have you been law

18  enforcement?

19       **THE WITNESS:**  In law enforcement, total,

20  approximately 17 years.

21       **THE COURT:**  And how long did you stay with border

22  patrol?

23       **THE WITNESS:**  Just under ten years.

24       **THE COURT:**  For the other seven, what did you do,

25  sir?

                    BRYNN DOCKSTADER, RMR
                      (305) 523-5635

7

1          **THE WITNESS:**  Two years with the Hamilton County

2    Sheriff's Department in Indiana.

3          **THE COURT:**  Hamilton?

4          **THE WITNESS:**  Hamilton, as in the President, and

5    five years with the Gaston Police Department also in

6    Indiana.

7          **THE COURT:**  How far did you go in school, sir?

8          **THE WITNESS:**  I have four-year college degree in

9    criminal justice and a minor in business foundations.

10          **THE COURT:**  Thank you, sir.  You may inquire.

11          **MR. POWELL:**  Thank you, Your Honor.

12                        **DIRECT EXAMINATION**

13    BY MR. POWELL:

14    Q    Agent Solek, I don't know if you were asked this or

15    answered, how long have you worked at the Ft. Lauderdale

16    Airport?

17    A    Since July of 2000.

18    Q    And do you know a Juan Fernando Pineda?

19    A    Yes.

20    Q    Is he in the courtroom today, and if he is, would you

21    point him out and describe that he is wearing for the

22    record?

23    A    Yes, he is the individual sitting to the left of

24    defense counsel, wearing a standard issued jail uniform.

25          **MR. POWELL:**  May the record reflect the witness

8

```
 1   has identified the defendant?

 2            THE COURT:  All right.

 3   BY MR. POWELL:

 4   Q    Calling your attention, sir, to November 17th, 2000,

 5   were you on duty with the border patrol on that date?

 6   A    Yes.

 7   Q    Were you on duty working at the Ft.

 8   Lauderdale/Hollywood Airport?

 9   A    Yes, I was.

10   Q    Did you have occasion to come in contact with Juan

11   Fernando Pineda?

12   A    Yes, I believe I did.

13   Q    Would you relate the circumstances in which Mr. Pineda

14   came to your attention to the Court at this time?

15   A    During the day and time in question, we had just

16   arrived at Terminal 4, and I had taken a position against

17   the back wall of the airport to observe the passengers in

18   this area.

19            THE COURT:  What time was it?

20            THE WITNESS:  I'd have to look at the report to

21   see the time.  It was just a few minutes prior to the actual

22   arrest of Mr. Pineda, but I don't know without look the

23   looking at my report.

24   BY MR. POWELL:

25   Q    Where is your report?
```

1    A    On the back table.

2         MR. POWELL:  May I approach the witness, Your

3    Honor?

4         THE COURT:  Sure.

5         THE WITNESS:  I would say approximately 9:20, 25,

6    I was in the Terminal 4 at the airport and then --

7         THE COURT:  Morning or night?

8         THE WITNESS:  It was in the morning, ma'am.

9         THE COURT:  Thank you.

10   BY MR. POWELL:

11   Q    And what airline were you -- what airline passengers

12   were you observing?

13   A    We were observing all passengers in Terminal 4, as the

14   ticket counter is all together in that one area, but from

15   my location in past experience we were observing passengers

16   in the Spirit Airline ticket counter.

17   Q    Does Spirit Airline have any significance to you?

18   A    Yes, it does.  We have arrested numerous individuals

19   in the transportation of narcotics or illicit currency

20   using this airline.

21   Q    On this date and time did anybody in particular among

22   the passengers stand out?

23   A    Yes.

24   Q    Who?

25   A    The defendant, Mr. Pineda?

                    BRYNN DOCKSTADER, RMR
                       (305) 523-5635

10

1    Q    Why?

2    A    Mr. Pineda was standing in line with the other

3    passengers.  It was noted that he was wearing a large

4    full-length coat where the temperature outside the airport

5    was fairly warm.  The temperature inside the airport was

6    also a comfortable temperature.

7         The other passengers in the airport that did have

8    coats that were traveling to eastern destinations, or

9    northeastern destinations had their coats over their arms

10   because it was warm in the airport.

11        Mr. Pineda was further observed to be having or

12   have or wore a white shirt that was untucked from his pants

13   and rather full in length.  Also baggy pants.

14        Mr. Pineda was also observed, while standing in

15   line, that he would adjust the front of his shirt by pulling

16   down on the tails of his shirt.  Then while standing erect,

17   he would then tilt his head down, looking towards his

18   waistband.  He would then look back up.

19        He would pull the folds of his coat closed in

20   front of him and then place his hands directly in front of

21   his waist, remain there just for a few moments, and then

22   repeat the procedure all over again.

23        And he did this numerous times, at least five or

24   six times that I observed while he was standing in line.

25   Q    Can you describe the coat?

BRYNN DOCKSTADER, RMR
(305) 523-5635

11

1   A    The coat was a like a military green.

2   Q    Trench coat?

3   A    Trench coat full in length, so it went all the day

4   doubt past his knees.

5   Q    And the fabric?

6   A    The fabric was a wool-type, heavy wool-type fabric.

7   Q    And the temperature outside you said was warm.  Can

8   you give us an idea what the temperature was outside that

9   day?

10  A    The temperature appeared to be approximately 80

11  degrees at the airport.

12  Q    Can you stand up for a second.  You have gone over

13  with the Court what you are talking about, but can you

14  elaborate and show us what you saw him doing continuously?

15  A    Sure.  While the defendant was standing there, while

16  the defendant was standing there, he would stand there and

17  look around the airport, and look at all the passengers,

18  then while his shirt tails were hanging down, he would tug

19  on the shirt tails and his shirt so it was flat.

20        He would look down at his waistline to make sure

21  that nothing was showing or bulging.  He would then take the

22  folds of his coat and fold them in front of him, and then

23  hold his hands close to his body and his coat all the way

24  closed.

25        Then just went within a minute or two, he would

BRYNN DOCKSTADER, RMR
(305) 523-5635

12

1   then start looking around the airport again, open his coat,

2   adjust his shirt tails all the way around, and close his --

3   after checking his waist, he'd close his coat back up and

4   put his hands back in front.

5   Q   Thank you.  You may resume your seat.  What did you do

6   next?

7   A   We normally like to continue to observe the individual

8   as much as possible, but at this time a Spirit employee or

9   airline employee notified the passengers that anybody

10   traveling that did not have to check luggage and that had a

11   rearranged ticket could proceed directly to the gate and

12   check in.

13         So, at that time Mr. Pineda was observed to

14   quickly depart the line and head towards the security check

15   point.  At that time a consensual encounter was then made

16   with Mr. Pineda.

17   Q   All right.  Walk us through this consensual encounter.

18   Who was with you?

19   A   At that time Special Agent Shinn of the Drug

20   Enforcement Administration was present.

21   Q   You approached the defendant?

22   A   Yes.

23   Q   Both of you?

24   A   I initially approached the defendant and Mr. Shinn

25   remained to the back and to my right side.

13

1    Q    When you approached him, you get in front of him and
2    stop him?
3    A    No, I approached the individual from behind, and
4    obtained his attention and identified myself at that time
5    as a law enforcement officer.
6    Q    Were you walking with him?
7    A    Yes.
8    Q    On the way to the plane?
9    A    When upon identifying myself, the individual stopped
10   on his own accord.
11   Q    Did you circle around and block his path to the plane?
12   A    No, we did not.
13   Q    Did you have your guns drawn?
14   A    No, we did not.
15   Q    Were you in uniform?
16   A    No, we were in plain or casual clothing.
17   Q    Did you have radios displayed or handcuffs jingling?
18   A    No police items or emblems to identify ourselves was
19   displayed.
20   Q    Did you identify yourself?
21   A    Yes, I identified myself by displaying a badge and
22   credentials, and after showing them to Mr. Pineda, I then
23   reconcealed these items.
24   Q    What did you say?
25   A    I advised Mr. Pineda that we were law enforcement

14

1    officers and if he would mind speaking to us for a moment

2    and Mr. Pineda said yes and he stopped.  I then advised

3    Mr. Pineda of our duties at the airport.

4           **THE COURT:**  Tell us exactly what you said?  Did

5    you say, "We are law enforcement officers"?  Or, did you

6    tell him where you were from?

7           **THE WITNESS:**  I would have said, "As assigned to

8    the Task Force, I am also a Broward County Sheriffs Deputy,

9    so I would have displayed my Broward County credentials and

10   advised Mr. Pineda I was a Broward County Deputy and I would

11   have said --

12   **BY MR. POWELL:**

13   Q    Don't say, "I would have said."

14          The Court's question was real straight.  What did

15   you say to the best of your recollection?

16   A    To the best of my recollection, I would have displayed

17   my ID and say, "Excuse me, sir" --

18   Q    You did say, "Excuse me, sir"?

19   A    -- "Broward County Sheriffs.  Do you mind if I speak

20   with you for a moment?"

21   Q    What did he respond?

22          **THE COURT:**  I'm confused here.  Is he a Broward

23   County Sheriff, or is he a senior patrol agent with border

24   patrol.

25          **MR. POWELL:**  I think he is both.

BRYNN DOCKSTADER, RMR
(305) 523-5635

15

1          **THE WITNESS:**  Yes, I am -- my full duties is as a

2    U.S. Border Patrol Agent, but I am assigned to a Task Force

3    also a Broward County Deputy as assigned to this Task Force.

4          **THE COURT:**  Okay.

5    **BY MR. POWELL:**

6    Q    In your dual capacity what did you do then?

7    A    Mr. Pineda stated "Yes," and stopped.  And then I

8    advised him of our duties, which I would have said --

9    Q    What are your duties?

10   A    "We are working here at the airport.  We are checking

11   passengers throughout the terminal to make sure that no

12   dangerous items are getting on the planes or transporting.

13   We are making sure that no contraband or illegal items are

14   being transported through the airport."

15   Q    Then what happened?

16   A    From there, I would have asked him --

17   Q    Not "would have," what did you?

18   A    I basically stated, "Do you mind speaking with us?"

19   And he said, "Yes," again.  I would have then asked his

20   route of travel and --

21   Q    You asked him his route of travel?

22         **THE COURT:**  Not "would have."

23   **BY MR. POWELL:**

24   Q    You keep saying "would."

25   A    I can't say because I have a tape recorder with me.

1    I'm not writing notes down.

2    Q    Agent, we are not asking you to be verbatim.  You see

3    what I'm saying?  We are prefacing the question with to the

4    best of your recollection what was said?

5    A    I asked Mr. Pineda his route of travel.

6    Q    What did he say?

7    A    He was coming from Ft. Lauderdale.  He was traveling

8    to New Jersey for a postal interview.

9         I asked him -- I'm not 100 percent sure if he was

10    traveling alone, if he had any other luggage with him.  He

11    said he had been traveling alone.  This was the only luggage

12    he had.

13         I asked him if he was carrying any type of

14    contraband or weapons on his person.  He stated no.

15         I asked him if he could specifically search his

16    bag that he was carrying.  Mr. Pineda at that time

17    immediately dropped his bag, took a step back from the bag

18    and said yes.

19         While Agent Shinn then searched the bag, I

20    specifically asked Mr. Pineda if he had any type of illegal

21    contraband or weapons underneath his clothes or around his

22    waist.  Mr. Pineda stated no.

23         I then asked Mr. Pineda if he minded if I did a

24    search, or a pat-down, so I could specifically check.

25         Mr. Pineda, you could see his lip was now

BRYNN DOCKSTADER, RMR
(305) 523-5635

17

```
 1   quivering, his bottom lip, and he stated yes, that would be

 2   okay.

 3            Mr. Pineda then voluntarily, without me

 4   indicating, and normally we don't do this because it is just

 5   a pat-down, he turned around on his own, and then I began to

 6   feel around his waist, when I felt the hard objects or

 7   pellets in the groin area.

 8   Q    When you felt something around his waist, in the lower

 9   areas, what did you say?

10   A    I asked Mr. Pineda what this was.  He hesitated for a

11   moment and he stated that it was heroin.

12   Q    What did you do then?

13   A    Mr. Pineda was taken into an investigative detention

14   and taken back to the airport office for further

15   investigation.

16   Q    Did you do a complete certain of him there?

17   A    At the airport office, yes.

18   Q    But it did not occur in the corridor?

19   A    No, it did not.

20   Q    From the start of your approach, time-wise, when you

21   walked up to him and he is walking to the -- through the

22   airport until the time that you did the pat-down and

23   discovered the heroin, how much time, elapsed?

24   A    It was less than two minutes.

25   Q    When he said, for example, that I'm traveling to New
```

BRYNN DOCKSTADER, RMR
(305) 523-5635

1   Jersey to go to a postal interview, did you take his ticket

2   and confirm this?

3   A    No, Mr. Pineda, I believe, was traveling on an

4   electronic ticket.  No ticket was taken from him.

5   Q    So, he had no ticket?

6   A    As far as I know at that time, yes.

7   Q    During the period up until the time he consented to

8   talk to you, or even after that, if he just said, "I have

9   got to go.  I'm going to be late for my plane."  Could he

10  have left?

11  A    Yes.

12  Q    When, of course, you discovered the heroin could he

13  have left?

14  A    No.

15  Q    Did you read him any rights, and if so, what rights

16  did you read him?

17  A    I advised Mr. Pineda back at the airport office of his

18  Miranda rights.

19  Q    What did he say?

20  A    Mr. Pineda stated that he understood his rights and

21  waived those rights and agreed to speak with us at this

22  time without an attorney present.

23  Q    And what did Mr. Pineda tell you?

24  A    Mr. Pineda just stated that he was transporting

25  heroin, that he initially had about 150 pellets of heroin

1    that he was transporting internally.

2           That upon arriving into the U.S. from Colombia, he

3    proceeded to a hotel where the large majority of these

4    pellets were passed then passed.  After passing these

5    pellets, he then proceeded to his father's residence, where

6    the remaining pellets, or what he believed to be some

7    remaining pellets were then passed again.

8           Upon these pellets passing, he then made

9    transportation arrangements to go to New York to deliver the

10   heroin for approximately a $10,000 fee.

11   Q    Did he come in initially to Miami or Ft. Lauderdale?

12   A    I believe it was initially through Miami with the

13   heroin.

14   Q    Now, did he have any more pellets in him?

15   A    I believe so.  The individual informed us that he

16   possibly had some additional pellets still in his stomach,

17   so arrangements were immediately made to get him to the

18   local hospital, which I believe he did pass a few more

19   pellets.

20   Q    Did this entire encounter take place in Broward

21   County, Florida, here in the Federal Southern District?

22   A    Yes, sir.

23          **MR. POWELL:**  The United States has no further

24   questions of this witness at this time.

25          **THE COURT:**  Mr. Bidwill?

BRYNN DOCKSTADER, RMR
(305) 523-5635

1                              **CROSS-EXAMINATION**

2       **BY MR. POWELL:**

3       Q     Good morning, Agent, just so we are clear, you are

4       with the border patrol, but you are cross-designated as

5       sheriff's deputy?

6       A     That's correct, sir.

7       Q     How long have you been working for the sheriffs as

8       well?

9       A     Since July of 2000.

10      Q     How long have you been working with the domestic

11      interdiction unit at the Ft. Lauderdale Airport?

12      A     Since July of 2000.

13      Q     You work there at that airport in conjunction with a

14      number of other federal and state narcotics agents,

15      correct?

16      A     Yes.

17      Q     And the objective of the unit is primarily to locate

18      drugs and narcotics that are being curried through the Ft.

19      Lauderdale airport?

20      A     Narcotics or illicit currency.  Anything illegal, yes,

21      sir.

22      Q     And how many courier-type arrests or seizures have you

23      been involved in since last July?

24      A     20, 25, maybe.  Altogether.

25      Q     Now, turning to November the 17th which was the day

1    you contact came into contact with Mr. Pineda, correct?

2    A    Yes.

3    Q    This was at Terminal 4 at the airport?

4    A    Yes.

5    Q    That's where Spirit Airlines ticket counter is?

6    A    Yes, sir.

7    Q    There are other airlines there as well?

8    A    Yes, sir.

9    Q    And, in fact, Spirit itself has a number of different

10   counters because they fly to a number of different places,

11   correct?

12   A    They have -- I don't know.  It's all one --

13   Q    One big row?

14   A    One big counter, but like all airlines, they have a

15   number of different agents working along that counter, so

16   that they don't individual counters, but they have agents

17   working on different flights, yes, sir.

18   Q    And on November 17th, was that in fact the case, they

19   had a number of, more than one agent working at the long

20   counter they have?

21   A    I would say, yes, I believe so, sir.

22   Q    Do you have an independent recollection of that?

23   A    I don't recall them ever having really an individual

24   flight, so I would say, yes, there was probably more than

25   one agent.  I couldn't say with 100 percent certainty.

22

1    Q    Spirit Airlines is a relatively busy airline at the

2    Ft. Lauderdale Airport?

3    A    At times it is busy and at times it is slow.  It is a

4    smaller airline.  It is not as busy as Delta or US Air.

5    Q    On Friday morning, November the 17th of last year, was

6    it a busy morning in the Ft. Lauderdale terminal?

7    A    They had numerous passengers standing in line, yes,

8    sir.

9    Q    Now, specifically, I think you testified that you took

10   a position against the back wall to observe the passengers.

11   Specifically what wall are you referring to?

12   A    It would have been the entrance wall where the doors

13   are located to make entrance into Terminal 4, and then from

14   that position I would look forward, towards the counter

15   area.

16   Q    Okay.

17            **MR. BIDWILL:**  Judge, can I use your diagram then,

18   can I ask -- how would the Court prefer that I have him do

19   this from?

20            **THE COURT:**  It needs to be moved up front, so if

21   you could drag it around?

22            **MR. BIDWILL:**  I'm sorry.

23   **BY MR. BIDWILL:**

24   Q    Okay.  If I could ask you -- what I want to do is just

25   try to have you depict, draw as best as you can, the

1   general outline there, the setup in Terminal 4, so Judge

2   Vitunac can see where you were positioned.

3           Let's start with -- why don't draw the curb.  This

4   is on the second floor, correct?

5   A    Yes.

6   Q    Where people get dropped off there.  And this is the

7   curb where people can check bags, correct?

8   A    Yes.

9   Q    There are doors, that are automatic doors that you can

10  enter into, correct?

11  A    Yes.

12  Q    And these are these gaps that are depicted right here?

13  A    Yes.

14  Q    And the -- you enter into these doors and then

15  actually you enter into somewhat of a vestibule area that

16  has more doors, correct?

17  A    Yes.  There would be a second set of doors.

18  Q    Why don't you draw those.  Kind of like another line

19  right here, basically, right?  Because there are elevators

20  in this area right here, correct?

21  A    There is an elevator on this far wall.

22  Q    And the ticket -- why don't you draw the ticket

23  counter, if you could, once you walk into the terminal

24  area?

25  A    (Witness complies).

24

1   Q    Where are the escalators?

2   A    (Witness indicating).

3   Q    There is a two-floor terminal, correct?

4   A    Yes.

5   Q    The gates basically are generally over here, correct?

6   A    Down in this area.

7   Q    Down in that area, okay.  And then this is where the

8   ticket people were for Spirit Airlines, correct?

9   A    This -- actually, this door would be --

10   Q    And I understand this is approximate.

11        Why don't you put an "X" where you were or an "S"

12   exactly where you were located?

13   A    (Witness indicating.)

14   Q    You were standing with your back to this wall over

15   here, correct?

16   A    Yes.

17   Q    And the ticket personnel were up here.  Why don't you

18   put "T" maybe.

19   A    (Witness indicating).

20   Q    And the defendant was in a line, and the people

21   standing in a line, heading up to this ticket person,

22   correct?

23   A    Yes.  There was a line of people coming from -- they

24   have got a little open area or walkway here, and then

25   Spirit would have been actually, just this way a little bit

BRYNN DOCKSTADER, RMR
(305) 523-5635

25

1    more.  This would have been Spirit Airlines.

2    Q    And they wind around?

3    A    And then it would come.

4    Q    What is that?  What are the dots?

5    A    The dots here would represent, I guess, people in

6    line.

7    Q    Okay.  Now, when you first saw the defendant,

8    Mr. Pineda, how far away were you from him?

9    A    Six, seven feet.

10    Q    He was in this line right here?

11    A    Yes.

12    Q    You were fairly close to him?

13    A    Yes.

14    Q    And specifically where was Agent Shinn?

15    A    Agent Shinn came in the airport just a few minutes

16    after I did and stood right next to me.

17    Q    So, he was standing right next to you?

18    A    Yes.

19    Q    Were you -- was there any other officers of your unit

20    involved in this operation that day?

21    A    There was another officer that was over by the Spirit

22    ticket counter?

23    Q    And that was Detective Interian?

24    A    Yes.

25    Q    Were you communicating with each other by radio that

1   day?

2   A    We communicate with a Nextell phone.

3   Q    So, you communicating with Agent Shinn and Detective

4   Interian?

5   A    No, actually I didn't know -- I was communicating with

6   Detective Interian when I needed to, and then Agent Shinn,

7   who I had talked to previously, I believe that day, said he

8   was coming to the airport and then he showed up at Terminal

9   4, where we were at.

10  Q    I'm going to get a little ahead of myself, so you can

11  sit, but while we have we have the board, if you could show

12  the Court specifically, where Mr. Pineda went when he

13  exited the line and where you went, and how the consensual

14  encounter, as you described, occurred?

15  A    It would have been approximately right here at this

16  corner where the defendant would have stopped (indicating).

17  Q    Okay. So, he was in this line here. How long was he

18  in line?

19  A    I don't know how long he was in the line because when

20  I got into the airport, the defendant was already in the

21  line. But while he was there, I watched him for

22  approximately five minutes.

23  Q    All right. So, you were watching him for five

24  minutes, correct? And then he went -- they made the

25  announcement that you testified to and then he went this

27

1    way (indicating)?

2    A    Right.

3    Q    Towards the escalators?

4    A    Towards the escalators and the gate.

5    Q    And then you, I take it, followed and came up from

6    behind?

7    A    Right.

8    Q    And the encounter -- at any point did you move from

9    this area?

10    A    No, once the encounter took place and the defendant

11    stopped, that's where we remained.

12    Q    You didn't move at all from there?  Other than

13    ultimately going to the office?

14    A    If anything, we might have been out here, and as

15    passengers came by, we just said "Could you move?  Step to

16    the side, to allow the passengers who walked through this

17    area, without blocking their -- trying to get to their

18    gates and stuff, but it would have been just a few feet,

19    right in this area.

20    Q    Okay.  You can sit down.  Okay.  So, backing up, when

21    you were in position on the back wall and you noticed

22    Mr. Pineda, did you notice anyone else that day?  Was there

23    anyone else looking suspicious, in your opinion?

24    A    Not that I noticed no.

25    Q    This was around 9:25 that you testified to?

28

1   A    Yes, I believe so.

2   Q    And Mr. Pineda, according to your testimony, was

3   dressed in a full-length coat?

4   A    Yes.

5   Q    Did you take photographs of that coat?

6   A    I don't specifically know if we took photographs, but

7   that coat was placed into evidence, I believe or property.

8   Q    And what was it made out of?

9   A    It was made -- I believe it was made out of, like, a

10  heavy wool-type material, yes.

11  Q    It was a -- how far did it go on his legs?

12  A    I would say just below the individual's knees.

13  Q    Kind of like a trench-coat type coat?

14  A    Yes.

15  Q    Did it have a tie that went around that closed?

16  A    I do not recall a tie.

17  Q    And you testified he also had a white shirt on, a

18  long-sleeved shirt?

19  A    I don't know if it was a long -- I believe, it was

20  long-sleeved, but it was a white-button shirt.

21  Q    A white-button shirt that was tucked out, correct?

22  A    That was untucked, yes, sir.

23  Q    What kind of pants did he have on?

24  A    I believe he had on, like, dress slacks, baggy dress

25  slacks.

BRYNN DOCKSTADER, RMR
(305) 523-5635

```
 1    Q    And the coat, I understand as you described it, that

 2    he was closing it, but was it generally untied, basically,

 3    or unsecured?

 4    A    Yes.

 5    Q    By that I mean, when you first noticed him, it wasn't

 6    buttoned, as my coat is, for instance?

 7    A    No, sir.

 8    Q    Hanging loose, and unless somebody physically pushed

 9    the sides together it would remain open, correct?

10    A    Yes, sir.

11    Q    He was wearing a hat?

12    A    I do not believe so.

13    Q    No sunglasses?

14    A    No, sir.

15    Q    He was clean-shaven, did he appear to you?

16    A    Yes.

17    Q    Can you describe the bag that he was caring?

18    A    It was a small carry-on bag.  I couldn't advise the

19    color or the type of bag, no.

20    Q    Approximately how long?

21    A    I think it was just a smaller or medium-size carry-on

22    bag for the airports to allow them to carry them on the

23    plane.  So, it wasn't a large bag.

24    Q    And that was seized and I assume that's in evidence?

25    A    That was turned into property, Yes.
```

30

1   Q    Now, you testified on direct and you described what

2   you observed Mr. Pineda doing.  The first thing that drew

3   your attention to him was the coat; is that correct?

4   A    I guess it all occurred at once.  It was nothing

5   individual in nature, because it occurred actually quite

6   rapidly upon entering the terminal area where Mr. Pineda

7   was first observed.

8        I couldn't say if it was the coat or his actions,

9   but he was doing everything all at once.  So, it wasn't any

10  individual type action initially that drew my attention.  It

11  was everything all combined.

12  Q    Are you done?

13  A    Yes.

14  Q    And the pulling of the shirt that you described, that

15  occurred how many times in the five minutes you were

16  watching him?

17  A    At least five or six times, yes.

18  Q    And the closing of the coat, as you described it, that

19  occurred how many times in the five minutes?

20  A    At least five or six times.

21  Q    Are you sure of the exact amount?

22  A    No, I didn't take notes as to the exact amount.  If

23  anything, I would say it would be more.  I'm giving a

24  increased estimate.

25  Q    It is your testimony it certainly wasn't less?

BRYNN DOCKSTADER, RMR
(305) 523-5635

1   A    No.

2   Q    And was anyone else wearing a coat that day?

3   A    I did not observe anybody else wearing a coat inside

4   the terminal.

5   Q    Have you ever seen anybody in the Ft. Lauderdale

6   terminal wearing coats?

7   A    Yes, we have.

8   Q    And that is not an unusual thing for people flying to

9   the northeast in November through March when it might be

10  cold, correct?

11  A    They generally have coats, yes, sir.

12  Q    My question is, it is not unusual for somebody to be

13  wearing a coat in the terminal in Ft. Lauderdale before

14  boarding a plane to the northeast or the northeastern

15  climates of our country?

16  A    It occurs because it is rather warm in Ft. Lauderdale,

17  but it does occur, yes.

18  Q    As you testified, I think Spirit goes to the

19  northeast?

20  A    Yes.

21  Q    It flies to Newark, New York, LaGuardia, Detroit, Long

22  Island?

23  A    I don't believe they go to Islip or Long Island.

24  Q    Atlantic City?

25  A    I don't believe they go to Atlantic City.

32

1   Q    But a number of places in the North?

2   A    Yes.

3   Q    You testified -- the things that drew you to

4   Mr. Pineda were the coat, the pulling on the shirt, and the

5   closing of the coat, correct?

6   A    That and his actions, the way he was standing in line.

7   He was very rigid and stiff.  You could see him constantly

8   looking around the airport or scanning the airport.

9        We work there on a constant basis.  We watch

10  passengers all day long.  Normal passengers are calm,

11  relaxed, not the type of mannerisms that was being displayed

12  by Mr. Pineda.

13       He was very cognizant of his surroundings by

14  looking around.  As the line would move, he would move in a

15  stiff and orderly fashion.  He would not be milling around

16  as the other passengers would be looking at their watch, and

17  trying to figure out what time they were going to get on the

18  airplane.  So, there were several factors.

19  Q    And you had never seen him before, correct?

20  A    Prior to this, no.

21  Q    This was all in five minutes?

22  A    Yes.

23  Q    How many times did he look around and scan?

24  A    On a constant basis.  I couldn't give a number at all

25  for sure.  For sure each time prior to adjusting his coat

BRYNN DOCKSTADER, RMR
(305) 523-5635

1    and shirt tails, and then other times while standing in

2    line.

3    Q    So, you don't recall the exact number?

4    A    The exact number, no, sir, I do not.

5    Q    Now, the announcement was made that anybody who has an

6    electronic ticket was to go directly to the gate, correct?

7    A    I believe it was that anybody who had a ticket and did

8    not need to check a bag could proceed to the gate area,

9    yes, sir.

10    Q    And Mr. Pineda then left the line and went, as you

11    described, towards the escalators, correct?

12    A    The escalators don't go to the gates, but towards the

13    escalators, but it is next -- but he left the line fairly

14    quickly, in a hurry to get to the gate, yes.

15    Q    Something not unusual in an airport, somebody moving

16    quickly, correct?

17    A    No.

18    Q    And did other people leave the line?

19    A    Yes.

20    Q    And you approached Mr. Pineda, as you described, at

21    the corner there.  You were the one who came up, correct?

22    A    Yes.

23    Q    And Agent Shinn was how far behind you?

24    A    I think he was several feet behind me.

25    Q    And, I mean, the distance between where you were

BRYNN DOCKSTADER, RMR
(305) 523-5635

34

1    standing and where you spoke with Mr. Pineda was how far?

2    A    I'm sorry.  Say that again, sir?

3    Q    I apologize.  The distance from where you ultimately,

4    announced yourself through your presence to Mr. Pineda and

5    where you were standing against the wall and observing him

6    was how far.

7         How far did you walk before you said whatever you

8    said?

9    A    About 35 to 40 feet, in there somewhere.

10   Q    And Shinn came up with you how long?

11   A    I believe he was following behind several feet behind

12   me.

13   Q    But, virtually, simultaneously.  When you got up

14   there, he was right behind you within a matter of seconds

15   was with you?

16   A    He was there.  I had to quickly run to catch up to

17   Mr. Pineda.  So, I don't know how far back he was.  My

18   focus was on Mr. Pineda.  You'd have to ask Agent Shinn as

19   to exactly where he was.

20   Q    You didn't have any tips or information about the

21   defendant?

22   A    About the defendant, no, sir.

23   Q    Did you have any specific or even general tips or

24   information about that flight?

25   A    That specific flight?  No, sir.

BRYNN DOCKSTADER, RMR
(305) 523-5635

35

1   Q    And you had no arrest warrant and no search warrant,

2   correct?

3   A    That's correct, sir.

4   Q    And at that point in time you had no reason to believe

5   that he was armed with a weapon, correct?

6   A    We did not know if he was armed with a weapon or not.

7   Q    You had no reason to think that he was, correct?

8   A    The way the individual reacted and was reacting in the

9   airport with the items and coat that he was wearing, the

10  individual could have possibly had a weapon as well as

11  narcotics.  It was unknown.

12  Q    And once you came into contact with him, you were

13  dressed, as you said, plain clothes, correct?

14  A    Yes.

15  Q    Your badge, did you have a neck badge as well on a

16  chain?

17  A    I have a badge or a neck badge that holds my airport

18  ID, and then my badge would have been secured in my front

19  pocket.

20  Q    And you came up behind him and announced yourself In d

21  did you say?

22  A    "Excuse me, sir.  Broward County Sheriff's Department.

23  Do you mind if I talk to you for a moment?"

24  Q    How far were you from him?

25  A    I would have been, initial contact, just off his, one

BRYNN DOCKSTADER, RMR
(305) 523-5635

1    of his back shoulders, probably his left shoulder.

2    Q    It wouldn't have been a distance where you had to yell

3    or anything like that?

4    A    No.

5    Q    Did you touch him at all at that point in time?

6    A    I may have just touched his shoulder to let him know

7    that I was there, but I did not grab the individual at all.

8    Q    And the badge that you displayed to him was the one in

9    your pocket or the one around your neck?

10   A    Both.  Upon trying to catch up to Mr. Pineda, I would

11   have taken out my -- airport.

12            THE COURT:  Not "would have."

13            THE WITNESS:  I took out -- excuse me, Your Honor.

14   I took out my airport ID and then retrieved my badge, which

15   was one sealed this my pocket.

16   BY MR. BIDWILL:

17   Q    And the badge that was in your pocket was shown to

18   Mr. Pineda at that point?

19   A    Along with my airport ID, yes.

20   Q    And forgive me, the badge is a border patrol?

21   A    Broward County badge.

22   Q    And it has -- kind of like in a wallet-type setup?

23   A    It's on a belt clip holder, a circle, black background

24   holder.

25   Q    Okay.  And the airport ID identifies you as a border

BRYNN DOCKSTADER, RMR
(305) 523-5635

1    patrol agent?

2    A    It identifies me as an airport employee and indicates

3    BSO, Broward County Sheriff on the airport ID.

4    Q    I take it from your responses on direct examination

5    that you don't recall, Agent, exactly what you told

6    Mr. Pineda that day; is that correct?

7    A    As to exact -- I mean, I can't say exact, because I

8    could leave out an "I" or an "it" and it would not be

9    exact, but the best recollection what I testified to, sir,

10    yes.

11    Q    And, specifically, you told him you wanted to speak

12    with him, correct?

13    A    I asked the individual if I could speak with him.  I

14    did not tell the individual.  I asked the individual if I

15    could speak with him.

16    Q    And you testified that he agreed?

17    A    Yes.

18    Q    And then what did you ask him or tell him?

19    A    I then asked, or I did not ask, but I told the

20    individual that after he agreed to speak with us that our

21    duties at the airport, which would have been, again, I

22    would have stated that we check passengers traveling

23    through the airport.  We work here at the airport to check

24    to make sure that nothing danger or illegal gets

25    transported through or into the airport.

BRYNN DOCKSTADER, RMR
(305) 523-5635

38

```
 1    Q    Did you identify yourself as a member of the Domestic
 2    Interdiction Unit?
 3    A    Specifically not a member of the Domestic Interdiction
 4    Unit, no.
 5    Q    You testified on direct that you may have asked him
 6    the route of travel or may have asked him whether he was
 7    travelling alone or with luggage.  Do you remember with
 8    specificity asking those questions?
 9    A    I would have asked those questions.  As to exactly how
10    those questions were asked, I can't recall.
11    Q    Do you have an individual recollection of asking those
12    questions?
13    A    I would say, yes, I did ask those questions.
14    Q    The defendant was then -- by then, Agent Shinn is
15    right with you, correct?
16    A    He is still off my back shoulder a little bit, yes.
17    Q    You asked him the questions that you were speaking
18    about and then ultimately, Mr. Pineda was asked if you
19    could search the bag, correct?
20    A    Yes, Mr. Pineda was asked if his bag could be
21    searched.
22    Q    Who asked him that?
23    A    I would have asked him that.
24            THE COURT:  Would have or you did?
25            THE WITNESS:  I apologize again, Your Honor.  I
```

39

1  asked him.

2  **BY MR. BIDWILL:**

3  Q    Do you have an independent recollection of asking him

4  that, sir?

5  A    Yes.

6  Q    Did Agent Shinn show his badge?

7  A    Yes, sir, I believe so.

8  Q    A DEA badge?

9  A    He identified himself as a Drug Enforcement agent,

10 yes.

11 Q    Mr. Pineda correctly identified himself.  Did you ask

12 him his name?

13 A    No, I do not believe so at that point in time.

14 Q    And how did he respond to you when you asked him

15 whether you could search the bag?

16 A    He stated yes, and immediately dropped the bag on the

17 ground and took a few steps backwards.

18 Q    And Agent Shinn then searched the bag?

19 A    Correct.

20 Q    And no contraband was found in the bag, correct?

21 A    Correct.

22 Q    While Agent Shinn was searching the bag, you asked

23 Mr. Pineda if he had any type of drugs or drugs hidden on

24 his person, correct?

25 A    Illegal contraband or weapons.

40

1    Q    Specifically, what did you ask him at that point while

2    Agent Shinn was searching the bag?

3    A    I would have asked him if he had any weapons or

4    illegal contraband.

5    Q    You referenced on direct you asked him whether he had

6    it secured under his person or hidden around his waist?

7    A    That's correct.

8    Q    And Mr. Pineda told you he did not, correct?

9    A    Correct.

10    Q    It was then your testimony than you asked him for

11    permission to search his person?

12    A    Yes.

13    Q    You did that, correct?

14    A    Yes.

15    Q    Agent Shinn was down searching the bag still?

16    A    Yes.

17    Q    And at that point in time when you asked for

18    permission to search his person, he hesitated, didn't he?

19    A    Just for a moment, yes.

20    Q    His demeanor changed, correct?

21    A    Yes.

22    Q    And you noted hesitation in his voice?

23    A    Yes.

24    Q    What was his response?

25    A    He stated "yes."

41

1    Q    Now, you didn't have any written consent form,

2    correct?

3    A    Correct.

4    Q    You didn't tell him that he had a right to refuse your

5    request to search the bag, correct?

6    A    That's correct.

7    Q    You didn't tell him that he had a right to refuse your

8    request to search his person?

9    A    That's correct.

10   Q    When you initially came into contact with him, you

11   didn't advise him that he didn't have to speak to you?

12   A    Correct.

13   Q    You did not advise him that he was free to go on his

14   way?

15   A    Correct.

16   Q    Agent Shinn didn't advise him of any of those things

17   either, correct?

18   A    Not that I'm aware of, but you would have to ask Agent

19   Shinn.

20   Q    At that point in time you did search his body,

21   correct?

22   A    Correct.

23   Q    You felt around his waist as you would in any typical

24   pat-down search?

25   A    Yes.

```
 1   Q    And you noticed the bulge that you referenced on
 2   direct examination?
 3   A    Yes.
 4   Q    You hadn't seen that bulge before, correct?
 5   A    Correct.
 6   Q    You hadn't seen any bulge coming out of his clothes,
 7   correct?
 8   A    Correct.
 9   Q    And what happened then?
10   A    Upon feeling the item, I got a good feel of it, felt
11   the irregularities, the hardness of the bulge, and then
12   asked Mr. Pineda what this was.
13   Q    And what did he say?
14   A    He stated "heroin."
15   Q    Now, prior to you asking him what that was, you hadn't
16   read him his Miranda rights, correct?
17   A    Correct.
18   Q    Certainly, in your experience you believed at that
19   point that that was drugs, correct?
20   A    Possibly, yes.
21   Q    You testified that his lip was quivering, correct?
22   A    Yes.
23   Q    And the amount of time that had elapsed from the time
24   you initially asked him to stop until the time that, well
25   let me ask you this:  You put him in handcuffs at that
```

1    point, correct?

2    A    Yes.

3    Q    How much time had elapsed from the time you asked him

4    to stop at the corner there to the time you put him into

5    handcuffs?

6    A    It was less than two minutes.

7    Q    How much less?

8    A    Unknown.  I wasn't looking at my watch.  15, 20

9    seconds, maybe.  It was less that two minutes.

10   Q    It could have been as much as a minute and a half,

11   this whole thing took?

12   A    Possibly, yes.

13   Q    No more, right?

14   A    Less than two minutes is the best, because, again, I

15   didn't look at my watch, but I would say less than two

16   minutes in duration.

17        **MR. BIDWILL:**  May I have one moment, Judge?

18        **THE COURT:**  Yes, sir.

19   **BY MR. BIDWILL:**

20   Q    He was then taken into the office that you have there,

21   correct?

22   A    Yes.

23   Q    And that would have -- along one of the corridor in

24   the same terminal?

25   A    That would have been in Terminal 3.

44

1    Q    And you went in there with Agent Shinn and yourself

2    and Mr. Pineda?

3    A    And the other Detective Jose Interian.

4    Q    When you got into the office, what was the first thing

5    that you did?

6    A    The first thing was Mr. Pineda was photographed and

7    his clothes were removed where the hard object was located

8    and identified by Mr. Pineda as being heroin.

9    Q    Was he questioned at that point?

10    A    No.

11    Q    Ultimately, he was questioned in the office, correct?

12    A    Yes.

13    Q    And that's -- at what point did you do the Rights

14    Waiver Form?

15    A    I'm sorry.  What do you mean at what point?

16    Q    At what point did you read him his rights?

17    A    After photographs were taken, he sat down in a chair

18    and subsequently was advised of his Miranda rights.

19            **THE COURT:**  Presumably, before you questioned him?

20            **THE WITNESS:**  Yes, ma'am.

21    **BY MR. BIDWILL:**

22    Q    Did you question him at all other than out in the

23    hallway before reading him his rights?

24    A    I'm sorry.  Could you say that again?

25    Q    Other than what you asked him out in the hallway, what

45

```
 1    is this.  It is heroin.  Did you ask him any other

 2    questions before reading him his Miranda rights in the

 3    office?

 4    A    I don't believe so.  Nothing specific or that was

 5    indicated in the report without reading his Miranda rights

 6    to him.

 7          MR. BIDWILL:  May I have a moment, Judge?  That's

 8    all I have, Judge.  Thank you very much.

 9          THE COURT:  You don't have to redirect?

10          MR. POWELL:  Can I have one?

11          THE COURT:  One.

12                    REDIRECT EXAMINATION

13    BY MR. POWELL:

14    Q    Agent, did the defendant ever tell you to stop?

15    A    I'm sorry I was --

16    Q    Helping the court reporter?

17          MR. POWELL:  Can I ask it again?

18          THE COURT:  The exact same question.

19    BY MR. POWELL:

20    Q    Did the defendant ever tell you to stop?

21    A    No.

22          MR. POWELL:  No further questions.

23          THE COURT:  You may step down, sir.  Any other

24    witnesses for the Government?

25          MR. POWELL:  One.  DEA Agent Bob Shinn will be
```

46

1    brief.

2         THE COURT:  Watch your step as you come up to the

3    witness stand, please, sir.  Raise your right hand.

4                    ROBERT P. SHINN,

5    called as a witness on behalf of Government, having been duly

6    sworn by the Court, was examined and testified as follows:

7         THE WITNESS:  Yes, Your Honor.

8         THE COURT:  Have a seat, sir.  State your name,

9    spelling your last name.

10        THE WITNESS:  Name is Robert P. Shinn.  Spelling

11   of last name is S-H-I-N-N.

12        THE COURT:  What is your profession, sir?

13        THE WITNESS:  I'm a Special Agent with the Drug

14   Enforcement Administration.

15        THE COURT:  For how long?

16        THE WITNESS:  Approximately three and a half

17   years, actually four years.

18        THE COURT:  How long have you been law

19   enforcement?

20        THE WITNESS:  Since '88.

21        THE COURT:  What did you do before DEA?

22        THE WITNESS:  I was a police officer for eight

23   years with St. Louis County, Missouri.  Six years on the

24   road.  Two years narcotics.

25        THE COURT:  How far did you go in school?

BRYNN DOCKSTADER, RMR
(305) 523-5635

1        **THE WITNESS:**  I received a Bachelors of Science

2   degree at SAU Carbondale.

3        **THE COURT:**  In what?

4        **THE WITNESS:**  Administration of justice.

5        **THE COURT:**  You may proceed.  Thank you, sir.

6        **MR. POWELL:**  Thank you, Your Honor.

7                    **DIRECT EXAMINATION**

8   **BY MR. POWELL:**

9        Agent, we have heard lengthy testimony about the

10  events of November the 17th.  We are not going to go over

11  the whole thing again.

12        I just like to hit a couple of specific areas.

13  Were you on duty with DEA on November the 17th, 2000?

14  A    Yes, I was.

15  Q    Approximately 9:00 to 9:30 in the morning?

16  A    Yes, I was.

17  Q    At the Ft. Lauderdale Airport?

18  A    Yes.

19  Q    Do you know or did you come in contact with one

20  individual named Fernando Pineda?

21  A    Yes, I did.

22  Q    Is he in the courtroom today?

23  A    Yes.

24  Q    Would you point him out and describe what he is

25  wearing, please?

48

1    A    The gentleman in the khaki uniform next to

2    Mr. Bidwill.

3    Q    Did you have an occasion to observe him at the airport

4    that day?

5    A    Yes, I did.

6    Q    What were the notable things that the defendant was

7    doing that caused you to observe him or to, in effect, him

8    to stand out in the crowd?

9    A    What I noticed initially with Mr. Pineda was that,

10   looking around the airport, seeing different passengers

11   coming and going, Mr. Pineda stuck out because of the coat

12   he was wearing, initially.  It was a real thick, like, a

13   wool-full length trench coat.  And it was like a neon sign.

14            That's what attracted me right there when he was

15   in line.  And then when I watched his behaviors in line,

16   further, I kind of got more suspicious.

17   Q    Be specific.

18   A    His behaviors in line were specifically he was

19   constantly looking around, like he was conducting a

20   counter-surveillance and looking for law enforcement.

21            He was continuously adjusting his belt and

22   waistline and looking down to see if maybe something was

23   protruding or whatever.  Very -- it was very abnormal to me,

24   because of the experience I have been through Interdiction

25   and so forth.

BRYNN DOCKSTADER, RMR
(305) 523-5635

1    He appeared to be very nervous. And at that time

2  the overhead announcement was made for people with Spirit

3  Airline that have electronic tickets to go ahead and proceed

4  to the gate.

5    At that time I saw Mr. Pineda. He actually walked

6  towards me. I was actually by the exit doors and with my

7  back up to the wall. So, he actually got out of line and

8  approached me.

9    At that time I saw that he had his shirt, it was

10  untucked, and covering his waistline of his pants and so

11  forth. And, again, he had the jacket on and the carry-on

12  bag.

13    At that time he walked past me and then I started

14  walking behind him. The other agent, John Solek, he was

15  over here, and we approached him from the side at that time.

16  And John asked if he could speak with him and we identified

17  ourselves, obviously, as law enforcement. So, he knew he

18  was talking to law enforcement at that time.

19  Q    Were you carrying any guns?

20  A    Was I carrying any guns? Yes.

21  Q    Were they visible?

22  A    No.

23  Q    Police radios?

24  A    No.

25  Q    Handcuffs.

BRYNN DOCKSTADER, RMR
(305) 523-5635

1    A    No.

2    Q    Were you in plain clothes or uniform?

3    A    I was in plain clothes.

4    Q    Did the defendant agree to speak with you?

5    A    Yes.

6    Q    Did he appear cooperative?

7    A    He was very cooperative.  The whole approach, the

8    whole encounter was very cordial, both with us and the

9    defendant.

10    Q    What happened?

11    A    What happened was as John Solek did most of the

12    talking.  We, as systematically, how we do that, we have

13    backup officer and usually one person who does most of the

14    talking.  John was the person doing most of the talking.

15          When he talked to Mr. Pineda, he asked him -- he

16    explained the duties the duties of Domestic Interdiction.

17    He knew he was talking to narcotics officers and so forth.

18          And we asked him, or John asked him about the

19    destination, "Where are you going to go today?"

20          He said Newark, New Jersey, taking a postal, U.S.

21    postal interview.

22          And at that time Mr. Solek asked him if he had any

23    type of illegal contraband on him and so forth.  And Mr.

24    Pineda replied no.  And at that time Solek or Agent Solek

25    asked if we could search him and his carry-on bag at that

1    time he voluntarily consented to that.

2    Q    What happened?

3    A    I checked the carry-on bag and came up with nothing.

4    Agent Solek, who was standing next to me, he was -- he went

5    to the groin area and he felt numerous pellets and so

6    forth.

7            And I could see Mr. Pineda was kind of like

8    shocked a little bit, very concerned, and I asked him what

9    he had and he said heroin.

10           At that point in time I think Mr. Solek handcuffed

11   him.  He had handcuffs on him, but they were concealed and

12   we placed him into detention because in such a public area,

13   there are passengers coming and going back and forth, and we

14   wanted to take him to a private area so we could view the

15   heroin.

16           So, we escorted him back to Domestic Interdiction

17   Unit and requested him to take his pants down, and at that

18   particular time I saw two white cotton socks actually

19   overlapping the waist band to his pants.  And at that time

20   we looked into the socks and we saw numerous pellets of

21   heroin and so forth.

22           **THE COURT:**  You mean the socks were outside the

23   shirt?

24           **THE WITNESS:**  Your Honor --

25           **THE COURT:**  -- tucked in his underwear.

                    BRYNN DOCKSTADER, RMR
                       (305) 523-5635

1          **THE WITNESS:**  The socks were inside his pants, and

2    the top portion of the sock was overlapping the waist band

3    like that much (indicating).

4          **THE COURT:**  Covered by the white shirt?

5          **THE WITNESS:**  Yes, ma'am.

6    **BY MR. POWELL:**

7    Q    How much heroin did you recover?

8    A    Approximately 1.9 gross pounds, gross weight.

9    Q    Now, did you read the defendant his rights?

10   A    Mr. Solek did.

11   Q    And after his rights were read his Miranda rights, did

12   he agree to talk to you?

13   A    Yes, he did.

14   Q    What did he say?

15   A    He said that he was given the heroin by a subject

16   named Gorge LNU in Medine, Colombia.  He traveled on Aces

17   Airlines to Miami from Colombia, I believe on November

18   14th.

19         **THE COURT:**  What airline?

20         **THE WITNESS:**  Aces, A-C-E-S.

21         **THE COURT:**  You said LNU, LNU?

22         **THE WITNESS:**  LNU, Last name unknown.  Gorge.

23   **BY MR. POWELL:**

24   Q    Gorge gave it to him?

25   A    Anyway, for his transportation fees, Gorge was, or

53

1   Pineda was going to be paid $10,000 from the New York

2   contact.  Pineda was to fly to Miami, pass the pellets, and

3   then go up New York, and he was supposed to meet a New York

4   contact in Manhattan, a specific location in Manhattan in

5   midtown.

6          I guess the New York contact, from what I

7   understand, was furnished maybe a description and so forth.

8   I asked him how are they going to know what you are going to

9   look like and so forth?  And that was the situation, I

10  guess.

11         Jorge was going to call the New York contact and

12  furnish Mr. Pineda's description and approach him.  The New

13  York connection was going to go ahead and retrieve the

14  heroin from Mr.  Pineda and then in like a day or two, turn

15  around, and pay him the courier fee of $10,000, at which

16  time Mr. Pineda was going to fly back to Miami.

17  Q    Did Mr. Pineda agree to fly to New York with you and

18  deliver the heroin?

19  A    Yes, he did.  He was very cooperative.

20  Q    Were you able to put that together?

21  A    I placed a call to our New York office, DEA New York,

22  and I gave him the scenario.  At that point in time, one of

23  the assistant special agents in charge decided they could

24  not control the situation because of all the people in

25  midtown on a Saturday at this specific location and they

54

1    thought that it was in the interest of the government not

2    to lose any dope, and so forth, so they decided not to do

3    the controlled delivery.

4    Q    Did Mr. Pineda say anything about experience in this

5    field?

6    A    Yes.  He stated that he actually couriered cocaine in

7    from Colombia to Italy prior to this instance?

8    Q    Was he caught?

9    A    Yes, he was.

10            **THE COURT:**  Cross, sir?

11                    **CROSS-EXAMINATION**

12   **BY MR. BIDWILL:**

13   Q    Good morning, Agent?

14   A    Good morning.

15   Q    Sir, where were you specifically standing in the

16   terminal when you first saw Mr. Pineda?

17   A    By the entrance or exit doors.

18   Q    How far were you from Agent Solek?

19   A    Initially, Agent Solek was right next to me.  Then he

20   went up towards other -- not that line, but lines, like,

21   there's different airline booths and so forth.

22            He just went over towards the front of the line on

23   one of the other areas.  I'm not sure where it was at.  We

24   were like opposite of each other.

25   Q    So, you would have remained back by the --

                        BRYNN DOCKSTADER, RMR
                          (305) 523-5635

1   A    The doors.

2   Q    Kind of looking straight ahead at the terminal desks?

3   A    That would be correct, yes.

4   Q    And during this observation, he had actually left that

5   position?

6   A    Who had left?

7   Q    Solek had walked somewhere else?

8   A    Yes.

9   Q    And he walked specifically up towards the front?

10  A    He was like -- he was towards the front of the line.

11  Not that Spirit Airlines, but I think he was a little bit

12  over, like opposite where I was standing.  He was just

13  like -- we were opposites.

14  Q    So, in other words, if you were looking at the ticket

15  agent who is helping a customer?

16  A    Uh-huh (affirmative response).

17  Q    He would have been kind of adjacent to that customer,

18  looking back at you?

19  A    He was viewing other people.

20  Q    You weren't standing next to each other?

21  A    We were initially.

22  Q    For how long?

23  A    Actually, we were standing right next to each other,

24  right prior to the announcement about the people proceeding

25  to the gate.  I don't know how many minutes.  It's been a

1  while, but we were right next to each other for a while

2  because we were discussing Mr. Pineda, actually, Mr. Solek

3  and I were.

4  Q    And then the announcement is made and Mr. Pineda

5  leaves the line, correct?

6  A    Yes.

7  Q    It was right before that Agent Solek went up to the

8  front?

9  A    It was sometime prior to that because when the

10  announcement was made, I was by myself at that point in

11  time, and Mr. Pineda actually walked right to me.  He was

12  walking towards me and then veered off to the right and

13  then we proceeded to the gate and that's when I walked

14  right behind him.

15  Q    How long did you observe Mr. Pineda in line?

16  A    I would tend to say it was a good a good five, six,

17  seven minutes, I guess.  Right around in there.

18  Q    Were you outside at any point?  By "outside," I mean

19  outside the terminal of the airport?

20  A    Just walking into the terminal.  I wasn't doing any

21  type of surveillance outside the terminal.  Mr. Solek was

22  already inside the terminal.  I met him -- I was into

23  Terminal 3.  I was walking over from Terminal 3 into

24  Terminal 4.  He was already present.

25        Actually, he was already standing by the entrance

1    and exit doors to the terminal, Mr. Solek was, prior to

2    arrival.

3    Q    And you got in there, he brought Mr. Pineda to your

4    attention?

5    A    Actually, I saw him and I said, "Hey, look at that

6    guy.  He goes, "Yeah, I have been walking him."

7    Q    He had already been watching him for a period of time

8    before you even walked into the terminal?

9    A    That's correct.

10   Q    And you testified this coat was of great significance,

11   correct?

12   A    Well, the great significance that I found was that it

13   is just really stuck out because it was a hot day, and

14   there were other passengers in that terminal going to

15   northern destinations, but I saw them draping coats over

16   their arms and so forth or they may have packed their

17   coats.  You know what I mean?

18        This really stuck out because it was really hot

19   and it was a heavy jacket, full length.

20   Q    At the time he was standing in the line, he was he

21   wasn't outside.  He was inside the airport terminal,

22   correct?

23   A    He was inside the airport terminal, correct.

24   Q    I mean you have worked at that airport for a long

25   time, correct?

58

1    A    Yeah.

2    Q    It is not unusual for somebody flying to a northern

3    destination, while waiting in a line to be wearing a coat?

4    That wouldn't be an unusual?

5    A    Some people wear coats and jackets, yes.

6    Q    And there was nothing particularly strange about this

7    coat.  It was just a three-quarter length coat, correct?

8    A    No, I don't think that is correct.

9    Q    Go ahead.  I'm sorry.  I didn't mean to interrupt you?

10   A    The totality of the circumstances, again, I found it

11   to be very odd because honestly it just stuck out.  It was

12   like a neon sign right here.

13        He is only one who had such a jacket.  Very heavy

14   and very hot outside.  Very thick.  So, it was abnormal to

15   me.

16   Q    Do you have a picture of the coat?

17   A    I have the coat.

18   Q    Do you have it with you?

19   A    No, I don't.

20   Q    Do you have photographs of coat with you?

21   A    Not with me, no.

22   Q    You did take pictures, correct?

23   A    I believe I took a one of those One-step.

24   Q    Polaroid.  You usually keep those and keep those in

25   your file, correct?

                    BRYNN DOCKSTADER, RMR
                       (305) 523-5635

59

```
 1   A    In the file, but I kept the coat as non-drug evidence.

 2   Q    You don't have any photos here today, either?

 3   A    No, I don't.

 4   Q    Was the coat lined?  Do you remember that?

 5   A    Yes, it was lined.

 6   Q    And you also testified that he was looking around.  I

 7   mean, how long did this -- how long did you watch him look

 8   around?

 9   A    The entire time that I came -- he was looking around

10   the entire time until that announcement came and then he

11   was trying to get to the gate as quick as possible.

12   Q    And you said he adjusted the belt of his pants?

13   A    Yes.

14   Q    The waistline, kind of like that (indicating)?

15   A    Yes.

16   Q    How many times did he do that?

17   A    Numerous times.  I didn't count, but I mean, I can

18   demonstrate.

19   Q    Please.

20   A    He is looking around.  He is like this.  So, they can

21   see -- you can see me.  He was in line.  Here is the ticket

22   counter right here.  And there are people in front of him.

23   I'm behind him right here off to the side.

24         He's doing this almost the entire time

25   (indicating) looking down and doing this, you know, just
```

60

1    constantly scanning.  Always looking and then looking down

2    like this.

3    Q    The coat was open?

4    A    The coat was open.

5    Q    Did it have a tie or anything he could have tied it or

6    closed it?

7    A    He could have buttoned it.

8    Q    He could have buttoned it?

9    A    He could have buttoned it I believe.  The coat was

10   open and then he had a shirt out over his dockers, I

11   believe he had on or khakis.

12   Q    How far did the shirt go down?

13   A    A large shirt.  It went down probably to at least like

14   the thigh area.

15   Q    I mean he is a tall man?

16   A    He is a tall man.

17   Q    And you don't have a picture of the shirt, either?

18   A    We might.  Yeah, we have a picture of the shirt.  I

19   don't know if it is full-length here.

20   Q    Do you have it here?

21   A    No, it is part of the file.  I didn't submit it as

22   non-drug.  Just part of the file.

23   Q    You then approached him.  Did you see him do anything

24   else?

25   A    Just the behaviors that I saw, you know, the

BRYNN DOCKSTADER, RMR
(305) 523-5635

61

1   constantly looking around, manipulating of the belt, being

2   nervous, appearing nervous, and then just rapidly walking

3   towards the gate when the announcement was made.

4   Q    He appeared nervous?

5   A    He did appear nervous.

6   Q    What about him appeared to be nervous?

7   A    Just the way he was conducting himself.  I mean, it is

8   like other people.  He stuck out of line because of the

9   other people in line were, you know, pretty calm, whatever.

10   I mean --

11   Q    Standing with their hands like this?

12   A    And he is on, like, speed or something.  He is

13   nervous.  And, I mean, it is just a common characteristic.

14   Q    It's a common characteristic?

15   A    For drug-traffickers to be nervous.

16   Q    Have you ever seen anybody else nervous at an airport?

17   A    I have had many encounters as I'm sure you well-know

18   with other people that courier narcotics that have

19   behaviors and characteristics as Mr. Pineda.  Mr. Hertado,

20   Mr. Perez.

21        THE COURT:  His question was, have you ever seen

22   non-drug couriers nervous in an airport?

23        THE WITNESS:  To be honest with you, I don't

24   really see a lot of people to be nervous.  I mean, the ones

25   that we focus on are the ones that we approach.

62

1          **THE COURT:**  How many of them don't have drugs?

2          **THE WITNESS:**  The majority of them.  The majority

3   of them that we approach do have, either some type of drug

4   proceeds or narcotics.  There are occasions where we do

5   approach and they absolutely nothing.

6   **BY MR. BIDWILL:**

7   Q    How many drug arrests have you made at the Ft.

8   Lauderdale Airport in the last 12 months?

9   A    Me personally?

10  Q    Your unit?

11  A    I'll be honest with you Mr. Bidwill, I'd have to

12  research that.  We have had numerous, numerous drug

13  arrests.

14  Q    The government wrote in its revised -- it says 15

15  other drug courier arrests within the last 12 months in the

16  Ft. Lauderdale Airport?

17  A    That was concerning Spirit Airlines.

18  Q    Especially passengers using Spirit Airlines?

19  A    That is just Spirit Airlines, sir.

20  Q    Do you know anybody who is afraid of flying?

21  A    I'm sure there are people afraid of flying.

22  Q    Now, when you approached him from behind --

23  Mr. Pineda -- you came from behind in your position by the

24  door, correct?

25  A    Yeah, I was from behind and then what happened is --

63

1    you have been out to the terminal area.  They have all the

2    different ticket agent desks, and so forth, and there is an

3    opening and then you approach the magnetometers.

4    Q    Right.

5    A    We approached him from the side as he was going to

6    go -- he was quite a distance from the magnetometers.  I

7    would say where that door is, where the Magnetometer was at

8    and we approached him probably right here, but it was in

9    like a hallway area.

10            People were passing and going and so forth and we

11   were -- when we spoke to him, he stopped on his own accord,

12   and he was speaking us.  His whole right side was open where

13   he could have walked off to the magnetomters, if he wanted

14   to.

15   Q    He stopped because you asked him to stop?

16   A    Yes.  We identified ourselves and asked to speak with

17   him.  He stopped on his own accord and he was very cordial.

18   Q    Who was the one who spoke out of you and Agent Solek?

19   A    Mr. Solek.

20   Q    He was the first to identify himself?

21   A    We both did.  As I said before, in the Interdiction,

22   we don't like to confuse people.

23            If you have two people talk at the same the person

24   that you are encountering or approaching what is like, what

25   is going on?  He is trying to focus on who is talking so we

64

1    usually determine one person doing the talking.  The other

2    guy is a backup.  He is looking for characteristics and

3    nervousness and so forth.

4    Q    But when Agent Solek identified himself to Mr. Pineda

5    you were right there, correct?

6    A    Yeah, I was on the side of Mr. Solek.  I also pulled

7    out my credentials and identified myself as a DEA agent.

8    Q    And I mean that is your standard DEA credentials?

9    A    Yes.

10    Q    With a badge and a photo identification?

11    A    Yes.

12    Q    And you were dressed in plain clothes you said you did

13    have a firearm.  Where was that?

14    A    That was concealed.

15    Q    Where?

16    A    In a bag.

17    Q    Like in the front?

18    A    Yes.

19    Q    Did you have a jacket on or anything like that?

20    A    No.  I had a polo shirt.  It was a hot day.

21    Q    Tucked in.  So, the bag was out.  You could see the

22    bag?

23    A    Yes.

24    Q    Agent Solek, did he have a firearm?

25    A    I believe he did.

65

1    Q    And what was he asked, specifically, Mr. Pineda?

2    A    By Mr. Solek?

3    Q    Correct.  What did you observe?

4    A    What happened was, when we both approached, again, we

5    identified ourselves as law enforcement officers.  We

6    produced our badge and photo identification and asked to

7    speak with Mr. Pineda.  He agreed.  Then at that time

8    Mr. Solek explained our duties as Interdiction officers and

9    so forth.

10    Q    What did he tell him?

11    A    Basically, that we have a large drug problem in South

12    Florida and people do frequently use this airport to have

13    drug proceeds and contraband.  And I don't know the exact

14    wording, but, you know, "Do you have any of these things?

15    And he said no.

16         And he said, "Can we search your person and your

17    bag?  And he said, "Yeah, no problem."

18    Q    Did he ask him anything else?

19    A    He asked him his destination, where was he going to

20    go?  New York/New Jersey.

21         Was this business or pleasure?  He goes, "A little

22    of both.  It is business because I'm going to take a test

23    for the U.S. Postal Service" or an interview.

24         He had already had a test he passed and was going

25    for the interview and apparently he has a girlfriend up

66

1    there, as well, he is going to see up there.

2    Q    Was he asked anything else?

3    A    Just about -- no.

4    Q    Now, you didn't tell him Agent Shinn and Deputy Solek

5    didn't tell him in your presence that he was free to walk

6    away, correct?

7    A    No, we didn't say that.

8    Q    You didn't tell him that he didn't have to talk to you

9    at any point?

10   A    No, I didn't advise him that.

11   Q    He asked for permission to search the bag and the

12   person?

13   A    Yes.

14   Q    Who asked him that?

15   A    Mr. Solek.

16   Q    He asked him at the same time, bag and person.  Is

17   that your testimony?

18   A    I would tend to say because Mr. Solek was the one that

19   did the talking, you would have to ask him, honestly.

20   Q    You don't have an independent recollection of that?

21   A    I know that he asked permission to search Mr. Pineda

22   and his bag.  I'm not sure exactly how he expressed it.

23   Q    Do you recall what the defendant, how the defendant

24   responded to that?

25   A    He said, yes.  He was cordial with it, but he was very

67

1    nervous by our presence.  Very nervous.

2    Q    What made you believe that he was very nervous about

3    your presence?

4    A    His mannerisms.  When we were speaking with him, you

5    could tell he had like a look on his face of, like, just,

6    like, he was somewhat, like, frightened.  I believe his lip

7    was quivering a little bit and he just appeared nervous.

8    Q    So, he appeared to be frightened at that point when he

9    was speaking with you and Agent Solek?

10   A    Yes.

11   Q    Now, you didn't have written consent form for the

12   search, right?

13   A    No.  We don't do that, and the reason we don't do that

14   because we don't want to inconvenience passengers.  This is

15   a very brief encounter with a passenger.

16        We don't want to keep them reading and signing

17   forms and so forth.  They have flights to make.  So, it's a

18   very brief encounter.  We try to get in there.  We talk with

19   them, and then if they want to consent, that is fine.  If

20   they don't, that is fine.

21   Q    There is no form, correct?

22   A    No.

23   Q    You never told him that he had a right to refuse the

24   consent?

25   A    Right.

BRYNN DOCKSTADER, RMR
(305) 523-5635

68

1    Q    Agent Solek never told him he had a right to refuse

2    the consent?

3    A    To my recollection, no.

4    Q    And you searched the bag and there was no contraband

5    found in the bag, correct?

6    A    That's correct.

7    Q    And then Agent Solek searched his person, correct?

8    A    Yes.

9    Q    From the time that -- and then once he discovered, as

10   you said, the bulge or whatnot, he was then placed

11   handcuffs and then to the DIU office, correct?

12   A    No.  What happened was after he felt the pellets and

13   so forth, I asked him -- because I was right down --

14   actually, I was kneeled down.  The bag was right next to

15   him.

16         I told John, "Hey, the bag is clear" and I felt

17   him grabbing on something, I asked Mr. Pineda "So, what do

18   you got?"  And he is, like, "I got heroin."

19         "Okay, man.  It will be all right."  And at that

20   time Agent Solek placed him in handcuffs behind his back and

21   we escorted him back to the Domestic Interdiction Unit in

22   Terminal 3.

23   Q    What happened when you got back there?

24   A    At that point in time when we got back into the

25   office, we requested him to take down his pants at that

1    time.

2         That's when I saw the socks that were overlapping

3    the waistband of the pants and then we took the socks out

4    and we examined the contents of it, and it looked like

5    heroin pellets.

6         At that point in time Detective Jose Interian got

7    his gloves on, got a kit and field tested one of the pellets

8    which proved to be heroin.

9         **MR. BIDWILL:**  One moment, Judge.

10        **THE COURT:**  Yes, sir.

11        **MR. BIDWILL:**  Thank you, Agent Shinn.  Thank you,

12   Judge.

13        **THE WITNESS:**  Thank you.

14        **MR. POWELL:**  No further questions.

15        **THE COURT:**  That is it for the government

16   witnesses?

17        **MR. POWELL:**  The government rests.

18        **THE COURT:**  The defendant have any witnesses?

19        **MR. BIDWILL:**  I do, Judge.

20        **THE COURT:**  Let's take a ten-minute recess.

21        (Recess taken)

22        **THE COURT:**  Mr. Bidwill, witness?

23        **MR. BIDWILL:**  Ed Santiago.

24        **THE COURT:**  Mr. Santiago.  Good morning.  Step up.

25   To the witness stand please and raise your right hand.

1          **EDUARDO SANTIAGO,**

2    called as a witness on behalf of Defense, having been duly

3    sworn by the Court, was examined and testified as follows:

4          **THE WITNESS:**  Yes, I do.

5          **THE COURT:**  Have a seat, please, sir.  State your

6    full name and spell your last name.

7          **THE WITNESS:**  Eduardo Santiago.  S-A-N-T-I-A-G-O.

8          **THE COURT:**  What is your profession, sir?

9          **THE WITNESS:**  I'm a staff investigator for Mr.

10   Bidwell.

11         **THE COURT:**  You may inquire.

12                    **DIRECT EXAMINATION**

13   **BY MR. BIDWILL:**

14   Q    How long have you been so employed?

15   A    Three years with you.

16         **THE DEFENDANT:**  Now, may I approach the witness,

17   Judge?

18         **THE COURT:**  Yes, sir.

19         **MR. POWELL:**  No objection.

20   **BY MR. BIDWILL:**

21   Q    I'm going to show you, Mr. Santiago, what I've marked

22   as Defendant's Exhibit 1 and 2 for identification and ask

23   you whether you recognize those documents?

24   A    Yes.  I retrieved these from the Broward County Main

25   Library.

71

```
1   Q    And what are they?  What is Exhibit 1?

2   A    1 is the page of the Sun Sentinel, dated Saturday,

3   November 18, 2000, and it shows the weather.  It's page 220

4   something.  I can't read it.

5        And the second one is a newspaper article from the

6   New York Times, dated same date, November, and it's also a

7   weather report.

8   Q    And these are fair and accurate copies of what you

9   obtained?

10  A    Yes.

11       MR. BIDWILL:  Judge, I'd move Defendant's Exhibit

12  1 and 2 into evidence.

13       MR. POWELL:  No objection.

14       THE COURT:  Received.

15       (Defendant's Exhibits 1 and 2 were moved into

16  evidence).

17  BY MR. BIDWILL:

18  Q    Can you tell the Court what the weather was according

19  to the report there in Newark on November the 17th, the day

20  before the newspaper --

21  A    I'm reading paragraph that says Newark yesterday and

22  it says, 55/41/0.00, which indicates to me the high was 55

23  and the low was 41.

24       MR. BIDWILL:  Thank you.  May I approach again,

25  Judge?
```

1           **THE COURT:**  Yes, sir.

2   **BY MR. BIDWILL:**

3   Q    I hand you what have been marked as Defendant's

4   Exhibit 3 through 9 for identification.  Do you recognize

5   those exhibits?

6   A    Yes.

7   Q    What are they?

8   A    I took these photographs at the Ft. Lauderdale Airport

9   at the Spirit counter on February the 21st, started about

10  9:20.  It must have went on for about an hour.

11  Q    Do these photographs that we have, Exhibits 3 through

12  9.  Fairly and accurately depict what you observed at the

13  time you took them?

14  A    Yes.

15          **MR. BIDWILL:**  I'll move these into evidence as

16  Defendant's 3 through 9.

17          **MR. POWELL:**  No objection.

18          **THE COURT:**  Received without objection as 3

19  through 9.

20          (Defendant's Exhibits 3 through 9 were moved into

21  evidence).

22  **BY MR. BIDWILL:**

23  Q    Did you have occasion or -- the pictures will speak

24  for themselves -- or do the pictures depict people waiting

25  in line at Spirit Airlines?

1    A    Yes.

2    Q    Is anyone wearing a jacket?

3    A    Yes, several people wearing jackets.

4    Q    Are you familiar with the weather in Ft. Lauderdale

5    last week?

6    A    Basically, yes.

7    Q    What was it?

8    A    It was warm.

9         **MR. BIDWILL:**  That's all of Mr. Santiago.

10        **THE COURT:**  Would you hand those pictures to

11   Sandra.

12        **MR. BIDWILL:**  Yes, ma'am, I will.

13        **THE COURT:**  Any questions from the government?

14   How do you stipulate if you never see them?

15        **MR. POWELL:**  They are just pictures.  One

16   question.

17        **THE COURT:**  That's all you are getting.

18        **MR. POWELL:**  Thanks.

19                     **CROSS-EXAMINATION**

20   **BY MR. POWELL:**

21   Q    Mr. Santiago, anybody in these pictures wearing a

22   full-length Army green trench coat?

23   A    No, sir.

24        **MR. POWELL:**  No further questions.

25        **THE COURT:**  You may step down, sir.  Thank you.

74

1   Next witness?

2          MR. BIDWILL:  I'm going to be calling Mr. Pineda,

3   and I can just move these three in.

4          THE COURT:  I call Fernando Pineda.  Raise your

5   right hand, please, sir.

6                    FERNANDO PINEDA,

7   called as a witness on behalf of the Defense, having been

8   duly sworn by the Clerk, was examined and testified as

9   follows:

10         THE WITNESS:  Yes.

11         THE COURT:  Thank you, sir.  Have a seat.  Please,

12  tell me your full name and spell your last name.

13         THE WITNESS:  Fernando Pineda.  P-I-N-E-D-A.

14         THE COURT:  How old are you, sir?

15         THE WITNESS:  32.

16         THE COURT:  You may inquire.

17                  DIRECT EXAMINATION

18  BY MR. BIDWILL:

19  Q    Mr. Pineda, I want to ask you some questions about

20  what happened at the airport on the day of your arrest,

21  November 17th.  Do you remember that day?

22  A    Yes, sir.

23  Q    Can you tell the Court where you entered the terminal

24  at Spirit Airlines that day?

25  A    I entered through the arrival which was in the first

BRYNN DOCKSTADER, RMR
(305) 523-5635

1    floor.

2    Q    And how did you get up to the second floor?

3    A    Escalators.

4    Q    And what happened once you got to the second floor?

5    A    I proceeded to go to the Spirit counter.

6    Q    Did you have any trouble locating it?

7    A    No, sir.

8    Q    Can you describe for the Court, Judge Vitunac, how you

9    were dressed on that day, November the 17th, when you were

10   in the Ft. Lauderdale Airport?

11   A    At the airport I was wearing my wool jacket.  I was

12   dressed with a white long-sleeved jeans shirt and Dockers.

13   Q    And the jacket, was it --

14        **MR. BIDWILL:**  May I approach, Judge?

15   Q    I'm going to show you what's been marked as

16   Defendant's Exhibit 11, 13, 14, 15, 16 and ask you to take

17   a second to look at those photographs?

18   A    Yes.

19   Q    With the exception, of course, some of them that your

20   pants are open after your arrest, do those photographs

21   fairly and accurately depict the clothing that you were

22   wearing on the day of your arrest?

23   A    Correct.  Yes.

24        **MR. BIDWILL:**  I move these into evidence.

25        **MR. POWELL:**  No objection.

1          **THE COURT:**  Received.  11 --

2          **MR. BIDWILL:**  11 through -- skipping 12 and then

3      13 through 16.  And I'll move in 12 in.

4          **THE COURT:**  Okay.

5          (Defendant's Exhibits 11, 13, 14, 15, and 16 were

6      moved into evidence).

7      BY MR. BIDWILL:

8      Q    I want to show you what's been marked as Defendant's

9      Exhibit 12 for identification.  Do you recognize that?

10     A    Yes.

11     Q    What is that?

12     A    That's my carry-on bag.

13     Q    And is this the one that you had with you that day?

14     A    Yes, sir.

15     Q    Does this fairly and accurately depict the way it

16     appeared that day?

17     A    Yes.

18          **MR. BIDWILL:**  I would move 12 in as well, Judge.

19          **MR. POWELL:**  No objection.

20          **THE COURT:**  Received.

21          (Defendant's Exhibit 12 was moved into evidence).

22     BY MR. BIDWILL:

23     Q    Now, when you entered the airport, did you have the

24     coat on or off?

25     A    I had it off.

BRYNN DOCKSTADER, RMR
(305) 523-5635

77

1    Q    When did you put it on?

2    A    As soon as I went through the sliding doors to proceed

3    inside the airport.

4    Q    Why did you put it on?

5    A    Because it was cold inside.

6    Q    And how were you feeling that day?

7    A    I was kind of having like a fever, slight fever.

8    Q    Do you have any medical history, sir?

9    A    Yes, sir, I'm a diabetic.

10    Q    Now, the coat, when you did put it on, once you got in

11    the terminal, did you close it, button it?

12    A    No, sir.

13    Q    It remained essentially open?

14    A    Open.

15    Q    And is there any tie or is it just buttons?

16    A    Just buttons.

17    Q    And where were you traveling that day?

18    A    To New York/New Jersey.

19    Q    Did you have a ticket?

20    A    No, sir.

21    Q    Had you already paid for a ticket?

22    A    Yes, sir.

23    Q    What was your plan at the airport with regard to

24    getting on the plane?

25    A    To get my boarding pass.

BRYNN DOCKSTADER, RMR
(305) 523-5635

78

```
 1    Q    How did you pay for it?

 2    A    Credit card.

 3    Q    Did you have a ticket in your own name?

 4    A    Yes, sir.  The reservations was under my name.

 5    Q    Why were you in line?

 6    A    To get my boarding pass.

 7    Q    Were you with anyone else that day?

 8    A    No, sir.

 9    Q    Now, about what time was it that you entered the

10    terminal on the 17th?

11    A    A little past a quarter past nine.

12    Q    And how many people were in line when you got there,

13    approximately?

14    A    About seven in front of me.

15    Q    How long were you in the line -- at some point there

16    was an announcement that the agents testified to?

17    A    Yes, sir.

18    Q    What was the announcement that you recall?

19    A    For anybody who doesn't have any bags to check in and

20    only need their boarding pass to go to the ticket counter,

21    not the ticket counter, but inside the terminal.

22    Q    To the gate?

23    A    To the gate.

24    Q    And you responded to that because you felt you

25    qualified?
```

79

1   A    Yes.  As a matter of fact since I only had the

2   reservation I asked one of the agents if I had the

3   reservation, can I still go and the person, the agent said

4   yes.

5   Q    Now, how long were you in the line before they made

6   that announcement?

7   A    About ten minutes.

8   Q    Now, you heard the agents testify that while you were

9   in line, you were continually looking around.  Did that

10  occur?

11  A    No, sir.  Most of my attention was to three young

12  ladies who were in front of me and just looked around maybe

13  two or three times.

14  Q    You certainly weren't doing it repeatedly?

15  A    No, sir.

16  Q    Now, did you have occasion to tug at your pants?

17  A    Yes.

18  Q    How many times?

19  A    Two times.

20  Q    Why did you do that?

21  A    Because I wear a size 38 and those pants were a size

22  36, so they were fitting tight.

23  Q    Did you do it numerous times as the agents testified

24  to?

25  A    No, sir, twice.

BRYNN DOCKSTADER, RMR
(305) 523-5635

80

1    Q    Did have occasion to close your coat as was testified

2    to?

3    A    No, sir.

4    Q    In your mind, Mr. Pineda, did you believe you were

5    exhibiting any nervous mannerisms?

6    A    No, sir.

7    Q    Now, when you left the line, can you tell Judge

8    Vitunac what happened?

9    A    As soon as I spoke to the agent of the Spirit Airline,

10   I turned around and started walking towards the gate.

11   Q    And what happened then?

12   A    As soon as I was getting around the corner, agent

13   Solek and Agent Shinn approached me.  Agent Solek reached

14   out to stop me and he proceeded to tell me that he was a

15   border patrol and that Agent Shinn that he was from the

16   Drug Enforcement Agency.

17   Q    You said you got around the corner, and we drew the --

18   Agent Solek drew this diagram.  Can you see that from here?

19   A    Yes, sir.

20   Q    Are you speaking of this corner right here

21   (indicating)?

22   A    Yes.

23   Q    Had you into then past the escalators?

24   A    No, sir.

25   Q    And what direction did they come from?

81

1  A    They came towards my left, from my left.

2  Q    From your left?

3  A    Yes, sir.

4  Q    So, as you were walking towards -- with the escalators

5  on your left, that came from that direction?

6  A    From that direction towards me, like, in front of me,

7  towards my left-hand shoulder.

8  Q    How did they -- what did they do, if anything, to get

9  you to stop?

10 A    They Agent Solek was the first one who spoke to me and

11 he said that "I'm Agent Solek from the border patrol."

12 Mr. Shinn identified himself as a Drug Enforcement Agent

13 and they told me that -- if they could ask me a few

14 questions which I agreed.

15 Q    And what happened next?

16 A    After that Agent Solek asked me where was I going to,

17 which I told him I was going to Newark, New Jersey for a

18 postal interview.  He asked me if I had any weapons or any

19 narcotics, which I replied no.

20 Q    What happened next?

21 A    I made a comment to Agent Solek about being border

22 patrol inside the airport, at which time he stated that

23 Florida is surrounded by water so he has to be here.

24 Q    Did they ever tell you, you didn't have to stop and

25 talk to them?

BRYNN DOCKSTADER, RMR
(305) 523-5635

82

1    A    No, sir.

2    Q    Did they ever tell you that you didn't have to speak

3    to them once they stopped you?

4    A    No.

5    Q    Did you believe at that point in time that you were

6    free to disregard their requests?

7    A    No, sir.

8    Q    What happened then?

9    A    Since we were in the middle of the corridor where

10   passengers were passing by, Agent Solek touched me and

11   proceeded to show me where to stand, which was right next

12   to the wall in the corner.

13   Q    And how far away was that from where you had initially

14   been confronted by them?

15   A    About five or seven feet.

16   Q    Did you believe that you had the ability to disregard

17   his request?

18   A    No, sir.

19   Q    Where did he touch you, specifically?

20   A    In my right shoulder.

21   Q    And tell the Court what happened next.

22   A    And then after that, he told me once more "where was I

23   going?"  I explained to him that I was going to New Jersey.

24   He told me if it was business or personal, and I told him a

25   little bit of both, that I was going to stay with my

BRYNN DOCKSTADER, RMR
(305) 523-5635

1    ex-girlfriend.

2         He then proceeded to ask me one more time if I had

3    any weapons on me, which I relied no.  And then he said if

4    he could check my carry-on bag and I said yes.

5         So, I placed it on the floor and as soon as I was

6    about to open the bag, he raised me up, once again, by

7    touching my shoulder.

8    Q    Who is he?

9    A    Agent Solek.  And then he told me to back off since

10   the bag was right next to me.  Agent Shinn then proceeded

11   to look in the bag and looking at me.

12        Mr. Solek, Agent Solek asked me one more time, "Do

13   you have any weapons or any drugs on you, narcotics?"  I

14   said no.  He raised my hands and patted me down.

15   Q    Now, let me just back you up a little so we are clear?

16   A    Uh-huh (affirmative response).

17   Q    The bag, when you put it down on the ground, Agent

18   Shinn was the one who searched it?

19   A    Yes.

20   Q    And he got down low?

21   A    Yes, he knelt down.

22   Q    Did you believe when they asked you for permission to

23   search your bag that you had the ability to refuse?

24   A    No.

25   Q    Did they ever tell you that you didn't have to consent

84

```
 1    to a search of the bag?

 2    A     No, sir.

 3    Q     Now, it was while Agent Shinn was searching the bag

 4    that Agent Solek searched your body?

 5    A     No.  He raised my hands up and then proceeded to put

 6    his hands on my waist.

 7    Q     Did he ask for permission?  Did either he or Agent

 8    Shinn ask for permission to search your person before he

 9    did that?

10    A     No, sir.

11    Q     Did you ever give them your permission to search your

12    person?

13    A     No, sir.

14    Q     Your person meaning your body?

15    A     My body, no, sir.

16    Q     And what happened then?

17    A     Then after that, he told me to turn around and placed

18    the handcuffs on me.

19    Q     How much time had elapsed between the time that they

20    initially confronted you to the time that he put the

21    handcuffs on?

22    A     I would say it was five minutes.

23    Q     Where did they take you?

24    A     To their office.

25    Q     And what happened at the office?
```

1    A    As soon as I walked in the door, Agent Shinn told me

2    to take my pants down.

3    Q    Did you comply?

4    A    Yes.  After I took my pants down, he then proceeded to

5    take pictures of what I had and Agent Solek started asking

6    me questions about where did I come from?  And he also

7    asked me where was I going, who was I going to give it to?

8    Q    And you answered his questions?

9    A    Yes.

10   Q    Were you read your rights at that point in time?

11   A    No, sir.

12   Q    When were you read your rights?

13   A    When Jose Interian walked in the door, a few minutes

14   later, about 10 minutes later, and then he asked Agent

15   Solek, "Have you read him his rights?"  Which then Agent

16   Solek grabbed a piece of paper and read me my rights.

17   Q    Had he already questioned at that point?

18   A    Yes.

19   Q    When they did the Rights Waiver Form were the times

20   accurate?

21   A    I believe so.

22        **MR. BIDWILL:**  May I have one moment, Judge.

23        **THE COURT:**  Yes, sir.

24        **MR. BIDWILL:**  That's all I have.  Thank you.

25        **THE COURT:**  Cross for the government?

1          MR. POWELL:  Thank you, Your Honor.

2          MR. BIDWILL:  I'll just move in for, Mr. Powell,

3    to make it clear, Defendant's Exhibit 17 and 18 by

4    stipulation with the Court's permission.

5          THE COURT:  Yes, sir.

6          MR. BIDWILL:  Just the drugs.

7          THE COURT:  That's fine.

8          (Defendant's Exhibits 17 and 18 were moved into

9    evidence).

10                      CROSS-EXAMINATION

11   BY MR. POWELL:

12   Q    Mr. Pineda, you testified on direct that you were

13   approached by the agents at the airport on the 17th?

14   A    Yes, sir.

15   Q    Did they take your ticket away from you?

16   A    No, sir.

17   Q    Did they pull out any guns?

18   A    No, sir.

19   Q    Did they show you their handcuffs and --

20   A    No, sir.

21   Q    Did they have radios and start talking to each other,

22   calling all over the airport?

23   A    No, sir.

24   Q    Did they block your path to the plane?  Stand there,

25   and say you can't go on the plane?

87

1    A    When they first stopped me, yes, sir.

2    Q    They did.  Your testimony is that they ran around in

3    front of you on the way to the plane and stopped you?

4    A    Not from the plane, no, sir, from the walk path, from

5    the hallway.

6    Q    That leads to the plane?

7    A    Yes, sir.

8    Q    And both of them or one of them?

9    A    Both of them.

10   Q    So, both the agents ran around -- your recollection is

11   that both the agents ran around in the corridor, got in

12   front of you, and blocked your path in the hallway that

13   leads to the plane?

14   A    Not ran, but they came towards my left-hand side and

15   they stood right in front of me.

16   Q    Got in front of you.

17   A    In front of me, and Agent Shinn was in back of Agent

18   Solek.

19   Q    So, were you walking fast or slow to the plane?

20   A    I was walking normal.

21   Q    Walking normal?

22   A    Yes.

23   Q    And so you are walking, like, you are proceeding in

24   this fashion?

25   A    Yes, sir.

88

```
 1   Q    And then your testimony is that Agent Solek ran around
 2   and got in front of you?
 3   A    Not ran, around, no.  He appeared from my left-hand
 4   side, in front of me, and stopped me with his hands put in
 5   front, yes.
 6   Q    By your description a moment ago, this is what the
 7   agents do.  Solek comes around like this, puts his hand up
 8   and at the same time Shinn walks around him and stands
 9   right behind him and also blocks your path, correct?
10   A    I never said that they came in back of me.  They came
11   towards my left-hand side, my left-hand shoulder.
12   Q    I'm just trying to find out -- your testimony was that
13   they blocked your path to the plane?
14   A    Yes, sir.
15   Q    And Shinn was behind Solek?
16   A    Correct.
17   Q    Now, you testified that you had no ticket?
18   A    Correct.
19   Q    And they asked to speak with you?
20   A    Correct.
21   Q    And you said, "No, I don't want to speak with you"?
22   A    No, I said yes.
23   Q    You said yes?
24   A    Yes, sir.
25   Q    And then you said it is okay to speak with you, did
```

89

1   they take -- did they explained what they were doing?

2   A   Yes.

3   Q   They asked for permission to search your bag?

4   A   Yes.

5   Q   You held onto the bag and tugged it away from them?

6   A   No, no.

7   Q   You didn't?

8   A   No, sir.

9   Q   You gave them the bag?

10  A   I gave them the bag.  I placed the bag on the floor.

11  Q   You put it on the floor?

12  A   Yes, sir.

13  Q   Did they draw guns and order you to put it on the

14  floor?

15  A   No, sir.

16  Q   When they said "May we search your bag?"  You said

17  yes, and you put it on the floor?

18  A   Yes.

19  Q   Now, did they in fact search your bag?

20  A   Semi-searched the bag.

21  Q   Did they open it?

22  A   They opened it.  He put his hand inside the bag while

23  looking at me, so he didn't go through it.

24  Q   Okay.  So, he opens it.  You saw him open it?

25  A   Yes.

BRYNN DOCKSTADER, RMR
(305) 523-5635

1   Q    Did you say "stop"?

2   A    No.

3   Q    Did he take out any of the contents of the bags and

4   hold them up?

5   A    No, sir.

6   Q    So he left everything in there?

7   A    Yes.

8   Q    Did you have some dirty socks and underwear in there?

9   A    No.

10  Q    So, he didn't take out your dirty socks and underwear

11  and hold them up for the whole airport?

12  A    No.

13  Q    He just stuck his hand in there, felt around?

14  A    Yes.

15  Q    Kind of a polite sort of search?

16  A    Yes.

17  Q    And then Agent Solek turns around and says, "May I

18  search your person?"

19  A    No, sir.

20  Q    He didn't do that.

21  A    He didn't do that.  Agent Solek did not do that, nor

22  Agent Shinn.

23  Q    How did they get their hands on your person to search

24  your waist area?

25  A    He placed my hands up and put his hands on my waist.

91

1    Q    Okay.  So, it's your testimony that you allowed them

2    to search your bag.  That was okay?

3    A    Yes.

4    Q    He did not ask to search your person?

5    A    No.

6    Q    Nor did you grant him permission?

7    A    No.

8    Q    Then he just walked up to you, I guess, threw your

9    hands up?

10   A    Yes.

11   Q    And then started patting you down?

12   A    Correct.

13   Q    And did he pat you down on your shoulders first?

14   A    Foe.

15   Q    Did he pat you down on your ankles first?

16   A    No.

17   Q    He went straight to your waist?

18   A    Waistline, yes.

19   Q    Waist?

20   A    Waistline, yes.

21   Q    Now, you testified that when you were in line on

22   direct, you were in line for the ticket, or the flight, you

23   did not constantly adjust your waist?

24   A    Constantly, no.  Twice.

25   Q    So, you didn't do this a lot like the agents

92

1    testified?

2    A    Correct.

3    Q    Now, they later found what is depicted in Exhibit 14,

4    16, and 17, correct?

5    A    Yes.

6    Q    How much does that weigh?

7    A    It says here, 1.8 pounds.

8    Q    So, you got 1.8 pounds of heroin hanging on the front

9    of your waist, do you not?

10   A    Yes, sir.

11   Q    So, it's your testimony, then, that you weren't

12   concerned about the 1.8 pounds hanging on your belt that

13   might drag it down.  Is that it?

14   A    Yes.

15          **THE COURT:**  That 1.3, does not include the

16   swallowed heroin?

17          **MR. POWELL:**  All of that was swallowed?  It was

18   passed in Miami and then --

19          **THE COURT:**  Then it goes to the sock.

20          **MR. POWELL:**  Then it goes to the sock, and then he

21   related to the agents that he thought he might have more, so

22   he was taken to the hospital where he passed four more.

23   Q    Now.  Lastly, Mr. Pineda, it is your testimony that

24   you did not feel like you had a right to leave?

25   A    Correct.

BRYNN DOCKSTADER, RMR
(305) 523-5635

```
1    Q    Were you nervous?

2    A    No, sir.

3    Q    So, you were not nervous?

4    A    No, sir.

5    Q    So, when they asked to speak with you, your bottom lip

6    didn't start quivering?

7    A    No, sir.

8    Q    And this is because you had done this before and you

9    were very casual about this?

10   A    No, sir.

11   Q    So, then, you could have been nervous?

12   A    I felt not be nervous.

13   Q    You felt --

14   A    I felt that I wasn't nervous, no.

15   Q    And that in an airport area, did you tell them that

16   you had to catch a plane, you had to go?

17   A    Yes.

18   Q    Now, I don't remember hearing that on direct, but

19   that's okay.  So, you told them that -- you said they want

20   to talk to you.  They want to search your luggage, and you

21   tell them, "I have got to catch a plane"?

22   A    Not that right then and there, no.

23   Q    When did you tell them that?

24   A    I told them during the questioning.

25   Q    Which questioning?
```

94

1    A    When they asked me where was I going to.  I said I had

2    to get on the plane to go to Newark/New Jersey.

3    Q    And then you said, "I have got to leave now"?

4    A    I didn't say it right now, no.

5    Q    Did at any time you ask them to let you go to the

6    plane?

7    A    No.

8    Q    Did at any time during this period they broadcast a

9    call for the plane?  The plane is leaving, the last call

10   for the plane?

11   A    No.

12   Q    Were people coming and going in this area?

13   A    Yes.

14   Q    Did they stop any of those people?

15   A    No, sir.

16   Q    Was your path to the plane blocked, or to the

17   entranceway to the corridor?  As I understand it, you

18   weren't even at the gate, yet, correct?

19   A    Correct.

20   Q    So, did at any time did they block your path to the

21   gate?

22   A    At the beginning they did.

23   Q    And then they moved out of the way?

24   A    And then they moved me to the side.

25   Q    All right.

95

| | | |
|---|---|---|
| 1 | A | The side of the wall. |
| 2 | Q | Okay.  Over to the side? |
| 3 | A | Yes. |
| 4 | Q | Out of the middle of the corridor? |
| 5 | A | Yes. |

6   Q    Now, when you moved over out of the middle of the

7   Corridor, did they then barricade your way to the plane?

8   A    No, they turned around so then I would be facing

9   outer, facing towards the street.

10  Q    You were facing towards the street?

11  A    Yes.

12  Q    That's what I'm trying to get at.

13  A    Okay.

14  Q    If you were facing towards the street, then, your path

15  to the plane was open, or they blocked it?

16  A    It wasn't open.

17  Q    So, you could have just left then?

18  A    Yes.

19  Q    You could have gone on the street and taken off?

20  A    Yes.

21         **MR. POWELL:**   United States has nothing further of

22  this witness.

23         **THE COURT:**   Redirect?

24         **MR. BIDWILL:**   None, Your Honor.

25         **THE COURT:**   The defendant have any other witness?

1           MR. BIDWILL:  The defense would rest.

2           THE COURT:  The government?

3           MR. POWELL:  The government rests.

4           THE COURT:  Do you want to rely on your pleadings

5    for argument or do you want to argue?

6           MR. BIDWILL:  I gave Mr. Powell a couple of cases.

7           THE COURT:  If you give them to me, I'll read

8    them.

9           MR. BIDWILL:  I just want to highlight those cases

10   that I provided to the Court.  There are three.  They

11   include Drayton, Washington, and Guappe, one of which, even

12   the government cites Washington in its response, at least

13   its supplemental response.

14          But the essential proposition that I cite those

15   cases -- those were bus cases, Your Honor, out of the 11th

16   Circuit.

17          One quote from Washington, I think, which is then

18   quoted by Drayton which I believe all three of them suppress

19   or reversed or found that the district court should have

20   suppressed the evidence.

21          The quote from Washington is "absent some positive

22   indication that there were free not to cooperate, it is

23   doubtful a passenger would think he or she had the choice to

24   ignore the police presence."

25          My argument, Judge, to be very concise is that the

1   government seized Mr. Pineda at the point in time that they

2   approached him, identified themselves with a show of

3   authority as police officers and began asking him questions

4   about narcotics.

5           That they did not have a reasonable suspicion to

6   do so at that point in time.  That any consent that they

7   claim that they had was not freely and voluntarily obtained

8   from Mr. Pineda; and that, therefore, everything that flowed

9   from the initial seizure at a minimum everything that flows

10  from the warrantless search obtained without consent should

11  be suppressed in this case, and that would include the

12  statements and the physical evidence.

13          **THE COURT:**  Mr. Bidwill, do they even need

14  reasonable suspicion to walk up to the defendant and say,

15  "Excuse me, would you mind answering my questions?"

16          **MR. BIDWILL:**  If somebody just walked up, there

17  are three tiers of inquiry.  The consensual encounter, a

18  brief temporary detention, and a full-blown arrest.

19          **THE COURT:**  Why isn't a it consensual encounter?

20          **MR. BIDWILL:**  First of all, there was two

21  officers.  The number is something that has to be

22  considered.  The Court has to decide based on the totality

23  of the circumstance, whether it falls into the second tier.

24  But the two officers immediately made a show of authority in

25  terms of showing their badges, one of them is a drug

1    interdiction officer, they began asking, as I can tell, very

2    quickly in the dialogue between them about drugs, identify,

3    or set out their purpose, which was drug interdiction.

4         This was not just one officer or even two casually

5    walking up and asking questions about Mr. Pineda, or of

6    Mr. Pineda without having initially advised them that we are

7    essentially interdiction officers and we are looking for

8    drugs.

9         And I think that really is an important fact that

10   transforms this, coupled with everything else, into a

11   seizure, and goes beyond simply a consensual encounter where

12   an officer maybe just walks up and says how are you doing?

13   What is your name?  Where are you going?  And can I ask you

14   say few questions.

15        There is more that happened here, it is our

16   position.  For that reason we think it goes into the second

17   tier and that they didn't have reasonable suspicion.

18        **THE COURT:**  I see a distinction with these bus

19   cases.  I have recommended suppression of several of the bus

20   cases and have been offended by the conduct where the bus

21   driver really isn't free to drive off in the bus.

22        And the law enforcement officers are delaying that

23   bus 45 minutes, an hour, while they search people's luggage,

24   or pair it to passengers to own up to bags.  But I've not

25   seen the government get on Delta Airlines and say, "Pilot,

99

1  we need about 45 minutes of your time here, while we

2  match-up these carry on bags to the passengers."

3          **MR. BIDWILL:**  That's not what happened here.

4          **THE COURT:**  It would be a cold day in Hades before

5  they get on Delta Airlines and do that or Delta allows them

6  to do that.

7          This situation seems to me to be different because

8  you are in an open terminal, and he's got all sorts of

9  places he can go and things to do, and he's not relying on

10  them to release his pilot or release his bus driver, but I

11  will read those cases with your argument in mind and get on

12  R&R as soon as possible.

13          **MR. BIDWILL:**  Can I just -- this is a follow-up on

14  that point for whatever it might be worth.  A case that I

15  think the government gave the Court because it was cited in

16  their motion, but I think it is Espinoza Guerra and this was

17  language in Espinoza Guerra that advocates that Court should

18  give close scrutiny for the presence of coercion even in

19  airport stops.  That was an airport case.

20          And the courts should closely scrutinize the

21  actions of law enforcement officers in the context of these

22  airports stops to make sure that they are not coercive.  I

23  think -- it's either a former 5th or 11th circuit.  I can't

24  recall.

25          While certainly this is not like the bus in the

100

1    sense that they are on the bus and held for an hour and a

2    half, I think the transitory nature of the airport or even a

3    bus station, whatnot, where people are trying to catch

4    planes, I think is something that would create a coercive

5    atmosphere, and I don't think any reasonable person in his

6    situation would you have felt free to walk away and ignore

7    these officers.

8            **THE COURT:**  All right.  Thank you.  We are in

9    recess.  Appreciate it.

10           (Proceedings concluded).

11

12

13

14                    C E R T I F I C A T E

15   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

16   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED.

17

18   _Brynn Dockstader_                    _3-21-01_____

     BRYNN DOCKSTADER, RMR                 DATE

19

20

21

22

23

24

25

                        BRYNN DOCKSTADER, RMR
                          (305) 523-5635

11/30/2000 22:04 FAX          FEDERAL PUBLIC DEFENDER        PB FPD                    @002

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6197-CR-FERGUSON

UNITED STATES OF AMERICA,          :

        Plaintiff,          :

v.          :

FRANCISCO PEREZ,          :

        Defendant.          :



FILED by ___ D.C.

NOV 3 0 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the defendant's Motion to Suppress Evidence and Statements (DE 18), which was referred to United States Magistrate Judge, Lurana S. Snow, for report and recommendation. The defendant seeks to suppress evidence seized during a warrantless search of his baggage and person at the Fort Lauderdale International Airport on July 12, 2000, and statements made by him immediately following that search. An evidentiary hearing was held on this motion on October 16, 2000.

### I. FACTS PRESENTED

Broward County Sheriff's Office (BSO) Detective Jose Interian testified that he is a member of Broward County Domestic Interdiction Unit, and was assigned to cover the Fort Lauderdale airport on July 12, 2000. Detective Interian, who was dressed in civilian clothes, observed the defendant as he entered the airport through the middle door. Detective Interian stated that the

defendant stopped as soon as he came through the door and turned around in a full circle.  According to Detective Interian, the defendant's eyes were wide open and he appeared to be nervous and looking for someone.  The defendant was wearing a Hawaiian shirt that was not tucked into his pants.

Detective Interian stated that the defendant got in line at the Spirit Airlines counter and again looked around with his eyes wide.  The defendant pulled down his shirt and looked at it, as if to see whether anything was protruding.  Detective Interian recalled that the defendant did this about five times while waiting in line.  Detective Interian and his partner, Detective Wolfkill, were standing to the left of the defendant.

Detective Interian related that after the defendant had obtained his boarding pass, Detective Wolfkill attempted to speak to him, but was not able to communicate.  Detective Interian then spoke to the defendant in Spanish, which Detective Interian speaks fluently.  Detective Interian identified himself as a police officer and asked the defendant for consent to search his bag and his person, which the defendant gave.

Detective Interian then informed Detective Wolfkill that the defendant he had obtained consent, and Detective Wolfkill began to search the defendant's luggage.  Detective Interian then asked the defendant if the bag belonged to him, if anyone had asked him to carry anything and if he was carrying any wrapped items. Detective Interian advised the defendant that he was looking for

2

contraband, and added that some people carry it their bags, while others strap it to their bodies. According to Detective Interian, at this point the defendant appeared to become very nervous: his carotid artery throbbed visibly and the defendant was not making eye contact with the detective.[1]

Detective Interian began his search of the defendant's person in the groin area. He immediately felt several hard pellets that were the size of a finger. Detective Interian had felt such objects before, and stated that they always were either heroin or cocaine. Detective Interian said to the defendant, "You have drugs - is it heroin or cocaine?" The defendant responded, "Heroin." Later the detective obtained permission from the defendant to remove the drugs.

Detective Interian then advised the defendant of his Miranda rights by reading from a form. The defendant acknowledged that he understood his rights and agreed to waive them. The rights form was signed by Detective Interian and Detective Wolfkill. The defendant then provided a detailed statement regarding his involvement in the offense charged in the instant indictment.

On cross examination, Detective Interian testified that when the defendant entered the airport terminal, Detective Interian

---

[1] Detective Interian stated that when he first encountered the defendant, he asked the defendant what he was doing in Florida. The defendant replied that he had come from New York to take care of debts, and later said that the debts were in Orlando. It was at this point that the defendant began avoiding eye contact.

11/30/2000 22:05 FAX          FEDERAL PUBLIC DEFENDER      WPB FPD          ☾005

was standing at the Spirit counter, about forty feet from the door.
The defendant walked straight toward the counter, and stood in line
for about ten minutes before he got his boarding pass.  Detective
Interian conceded that Spirit flies to destinations other than New
York.  Detective Interian denied receiving any tips regarding the
defendant, but did not recall focusing on anyone other than the
defendant that day.

Detective Interian stated that he was standing about five
feet from the defendant when the defendant reached the ticket
counter.  The detective began speaking to the defendant before he
finished his business at the counter.  Then the defendant walked
away, and Detective Interian and Detective Wolfkill followed behind
and continued talking to him.

Detective Interian conceded that he had no specific
suspicion that the defendant possessed a gun, and that when he felt
the object in the defendant's groin he knew that it was not a gun.
He also acknowledged that at the time the defendant was told that
he had drugs, the defendant was not free to leave.  Finally,
Detective Interian admitted that neither he nor his partner ever
advised the defendant that he did not have to speak to them and did
not have to consent to any search.

Hollywood Police Detective Robert Wolfkill testified that
he is a member of the South Broward Drug Interdiction Unit.  He
stated that currently large amounts of heroin are being transported
to New York through Fort Lauderdale, and that he picked the

defendant's flight because it was direct to New York.  Detective
Wolfkill related that the defendant adjusted his shirt and looked
at his groin area several times.  The detective testified that
there is no profile for domestic couriers, and the fact that the
defendant was a Latin male was not important.

The defendant testified on his own behalf, stating that
when he entered the airport on July 12, 2000, he had to walk about
four steps (three meters) to get to the line for his flight.  He
had with him a carry-on suitcase on wheels.  The defendant stated
that he was not looking around because he went right to the line,
where he stood for about fifteen minutes.  The defendant denied
pulling his shirt down while in line, as he had no reason to do so.

The defendant recalled that one of the police officers
(Detective Wolfkill) was waiting for him at the ticket counter.  As
soon as the defendant handed over his ticket, and before the
defendant became engaged with the woman at the counter, the officer
brought out his badge.  When the Cuban officer (Detective Interian)
joined them, he asked the defendant when he had arrived.   The
defendant replied, "Yesterday."  Detective Interian then asked why,
and the defendant replied that he was there to pay a debt at a
resort.

At that point, the woman at the ticket began asking
questions, and Detective Interian translated them.  Detective
Interian then inquired about the name of the resort, and the
defendant explained that it was a time share in Orlando that he was

5

paying for monthly.  Detective Interian asked if the defendant had
traveled to Orlando.  The defendant responded that he was there to
talk to a friend about making payments through the friend's bank
account, which was cheaper than using a credit card.

The officers then told the defendant that they should go
to a place on the side of the ticket counter.  Detective Wolfkill
carried the defendant's suitcase, while Detective Interian asked
the defendant if there was anything illegal inside.  The defendant
said there was not, but Detective Wolfkill already had opened the
bag.  Detective Interian then touched the defendant's groin and
announced that the defendant was carrying drugs in there.  The
defendant said, "Sorry," after which he was handcuffed and moved
into a room, where his shirt was lifted and photographs were taken.

According to the defendant, neither officer asked him for
permission to search the suitcase or his person.  Detective
Interian told the defendant not to lie, that if he did the
detective would not help him at all.  Detective Interian repeatedly
asked the defendant whether he was called by any other name, and
mentioned the name "Sergio."  The officers looked at the
defendant's body to see if he had any tatoos, and showed the
defendant a photograph of a black man and asked if the defendant
knew him.  The detectives stated that they had arrested the man in
the photograph the previous day, and added that the man was wearing
clothing similar to that of the defendant.

11/30/2000 22:06 FAX                FEDERAL PUBLIC DEFENDER        WPB FPD          ☾008

## II. RECOMMENDATIONS OF LAW

The defendant contends that he was unlawfully detained by the officers and that he did not voluntarily consent to the search of his person. He asks that the evidence obtained as a result of the improper seizure and search of his person be suppressed, and that his post-arrest statements likewise be suppressed as fruit of the poisonous tree. The defendant does not raise a Miranda issue and concedes that if the search and seizure were lawful, his statements are admissible.

The Supreme Court has held that police officers may approach individuals at random in airport lobbies and other public places to ask questions and to request consent to search their luggage, as long as a reasonable person would understand that he or she could refuse to cooperate. Florida v. Royer, 460 U.S. 491, 502 (1983); United States v. Mendenhall, 446 U.S. 544, 554 (1980). If, by physical force or show of authority, a reasonable citizen would not believe that he is free to ignore police questioning and go about his business, he has been unconstitutionally seized. Florida v. Bostick, 501 U.S. 429, 439 (1991); Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Even a minimal curtailment of an individual's liberty must be based on a reasonable and articulable suspicion that the person is engaged in criminal activity. Reid v. Georgia, 448 U.S. 438, 440 (1980).

In Reid, a DEA agent at the Atlanta airport noticed two men who appeared to be trying to conceal the fact that they were

travelling together.  The agent approached the men outside the terminal building.  He identified himself as a federal narcotics agent, and asked the two men to show him their airline ticket stubs and identification, which they did.  The tickets reflected that the suspects had stayed in Florida only one day, and the agent believed both men appeared to be nervous.  The agent asked them if they would return to the terminal to consent to a search of their persons and shoulder bags.  One man nodded his head, and the other responded, "Yeah, okay."  As they entered the terminal, one of the men began to run and abandoned his shoulder bag.  Id. at 439.

The Supreme Court held as a matter of law that the agent could not have reasonably suspected the men of engaging in criminal activity. The fact that one of the two men walked in front of the other and occasionally looked back at him did not indicate any wrongdoing, and "the other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." Id. at 441.  The agent's inchoate and unparticularized suspicion or hunch was insufficient to support the seizure of the suspects. Id., quoting  Terry v. Ohio, 392 U.S. at 27.

In the instant case, the police officers observed the defendant enter a Fort Lauderdale airport terminal, look around him with his eyes open wide and get in line for a flight to New York. On a few occasions while in line, the defendant pulled down on his

shirt and looked in the direction of his groin area as he did so. Based on the analysis employed in <u>Reid, supra</u>, the two detectives lacked any reasonable suspect that the defendant was engaged in criminal activitiy. Nevertheless, the detectives identified themselves as police officers and began questioning the defendant while he was still transacting his business at the ticket counter. It is doubtful that a reasonable person in the defendant's position would think he had a choice to ignore the police presence, since "[m]ost citizens, we hope, believe that it is their duty to cooperate with the police." <u>United States v. Washington</u>, 151 F.3d 1354, 1357 (11th Cir. 1998).

According to Detective Interian, he began by asking the same questions routinely posed by airport employees prior to boarding: whether the defendant everything in the defendant's luggage belonged to him and whether anyone had asked him to carry anything. He then told the defendant that he was looking for contraband and asked for consent to search the defendant's suitcase and his person. As soon as the defendant acquiesced, Detective Interian began a search of the defendant's groin area. Detective Interian stated that he had no reason to believe that the defendant was concealing a firearm.

Clearly the detectives initiated their encounter with a show of authority, and at no time advised the defendant that he was free to ignore their questions or refuse consent to search. While the failure to advise a suspect of his right to refuse consent does

9

not, in and of itself, render consent involuntary, it may be an important factor to be considered by a reviewing court. United States v. Guapi, 144 F.3d 1393, 1395 (11th Cir. 1998). In Guapi, as in the instant case, a typical passenger would not feel free to refuse the requests, but could consider them to be orders. And, as the Guapi court noted, it seems obvious that if police officers genuinely want to ensure that their encounters with passengers remain absolutely voluntary, they can simply say so. Id. at 1357. See also, United States v. Drayton, 2000 WL 1584545 (11th Cir. (Fla.)), October 24, 2000.

At the hearing, the prosecutor also suggested that the evidence be admitted as the product of a border search. This argument is frivolous, since the police officers had no reason to believe that the defendant had crossed a border prior to the search. United States v. Hill, 939 F.2d 934, 937 (11th Cir. 1991), citing United States v. Santiago, 837 F.2d 1545, 1548 (11th Cir. 1988); United States v. Garcia, 672 F.2d 1349, 1364 (11th Cir. 1982).

### III. CONCLUSION

The Government has failed to demonstrate that the police had a reasonable suspicion that the defendant was engaged in criminal activity, and his detention for questioning was not lawful. In addition, the Government has not met its burden of proving that the defendant's consent to the search of his person and luggage was voluntarily given. Accordingly, it is

RECOMMENDED that the defendant's Motion to Suppress be GRANTED, and the evidence and statements taken from him be excluded from admission at trial.

The parties will have ten days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with The Honorable Wilkie D. Ferguson, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1998), cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 30th day of November, 2000.

*Lurana S. Snow*

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

AUSA Tom Lanigan (FTL)
AFPD Martin Bidwill (WPB)